PUBLIC CITIZEN, et al., Plaintiffs,

v.

John CARLIN, in his official capacity as Archivist of the United States, et al., Defendants.

Civil Action No. 96–2840(PLF).

United States District Court, District of Columbia.

Oct. 22, 1997.

Michael E. Tankersley, Public Citizen Litigation Group, Washington, DC, for Plaintiffs.

Neil H. Koslove, Anne L. Weismann, Alina S. Kofsky, Jason R. Baron, U.S. Department of Justice, Washington, DC, for Defendants.

## OPINION

PAUL L. FRIEDMAN, District Judge.

This case involves a challenge to General Records Schedule ("GRS") 20, promulgated by the Archivist of the United States in 1995. Plaintiffs assert that GRS 20—a regulation governing the disposal of electronic records created by agencies of the federal government—is arbitrary and capricious, irrational and contrary to law. Currently before the Court are defendants' motion to dismiss and the parties' cross-motions for summary judgment. Upon consideration of the papers submitted, the arguments of counsel, the entire record and the applicable law, the Court concludes that in promulgating GRS 20 the Archivist exceeded his authority under Section 3303a(d) of the Records Disposal Act, 44 U.S.C. §§ 3301 *et seq.* The Court therefore grants plaintiffs' motion for summary judgment and denies defendants' motions to dismiss and for summary judgment.

## I.  BACKGROUND

In 1993, the United States Court of Appeals for this Circuit in *Armstrong v. Executive Office of the President* ("*Armstrong II* "), 1 F.3d 1274, 1287 (D.C.Cir.1993), held that electronic versions of documents are records that must be created, managed and disposed under the rules set forth in the

Federal Records Act, 44 U.S.C. §§ 2101 *et seq.*, 2901 *et seq.*, 3101 *et seq.*, and 3301 *et seq.* This holding left undisturbed the "agencies' ability to purge incidental electronic records from their files by acting, *with the Archivist's approval*, to dispose of those documents that lack 'sufficient administrative, legal, research, or other value to warrant their continued preservation.'" *Armstrong II*, 1 F.3d at 1287 (emphasis in original).

In 1972, the Archivist began authorizing disposal of electronic records through general schedules in very limited circumstances. In October, 1994, the Acting Archivist proposed revisions to GRS 20 to explicitly authorize all federal agencies to destroy agency records stored on word processing and electronic mail systems, as well as other electronic records, once the records have been printed in "hard copy" on paper or microform, and if the agency determines that it no longer needs the electronic version. *See* Notice of Proposed Records Schedule; Request for Comments, 59 Fed.Reg. 52,313 (1994) (*included in* Admin. Rec., Vol. I at 89–92).[1]

On August 14, 1995, the Archivist issued the present version of GRS 20. *See* Notice of Issuance of General Records Schedule, 60 Fed.Reg. 44,643 (1995).[2] GRS 20 authorizes the disposal of electronic records in fifteen enumerated categories, including electronic records created by computer operators, programmers, analysts, systems administrators and government staff using office automation applications. Specifically, GRS 20, Item 13 provides that word processing files recorded on electronic media, "after they have been copied to an electronic recordkeeping system, paper, or microform for recordkeeping purposes," may be deleted from the word processing system "when no longer needed for updating or revision." Notice of Issuance of

General Records Schedule, 60 Fed.Reg. at 44,649. GRS 20, Item 14, covering electronic mail records, provides that senders' and recipients' versions of electronic mail messages and attachments thereto may be deleted from the electronic mail system after they have been copied to an electronic recordkeeping system, paper or microform for recordkeeping purposes. *Id.*[3]

The government argues that (1) plaintiffs lack standing to bring this action; (2) the second count in plaintiffs' complaint—relating to the Office of the United States Trade Representative ("USTR")—is moot; and (3) the Executive Office of the President ("EOP") is not a proper party and should be dismissed from this action. In addition, the government maintains that it is entitled to summary judgment because the promulgation of GRS 20 did not violate the Administrative Procedure Act, while plaintiffs argue that the promulgation of GRS 20 was arbitrary and capricious, irrational and contrary to law.

## II. STATUTORY FRAMEWORK

The records creation, management and disposal duties of federal agencies are set out in a collection of statutes known collectively as the Federal Records Act (the "FRA"), 44 U.S.C. §§ 2101 *et seq.*, 2901 *et seq.*, 3101 *et seq.*, and 3301 *et seq.* The FRA is intended to assure, among other things, "[a]ccurate and complete documentation of the policies and transactions of the Federal Government," "[c]ontrol of the quantity and quality of records produced by the Federal Government," and "[j]udicious preservation and disposal of records." 44 U.S.C. § 2902.[4]

The FRA prescribes the exclusive mechanism for disposal of federal records: no rec-

---

1. Thirty-seven comments were received in response to the proposal. *See* Admin. Rec., Vol. I at 61–62 (Forum for the Discussion of Proposed Changes to General Records Schedule 20).

2. *See* Admin. Rec., Vol. I at 2 (Request for Records Disposition Authority).

3. The 1995 revisions to GRS 20 removed certain items from GRS 23 and placed the authority for disposing of those items under GRS 20. Pursuant to this change, disposition authority for records created on word processing and electronic

mail systems was moved from GRS 23, Item 2, to its current place in GRS 20, Items 13 and 14.

4. *See Armstrong II,* 1 F.3d at 1278 (*quoting* 44 U.S.C. § 2902(1), (2) and (5)); *see also Armstrong v. Bush* ("*Armstrong I* "), 924 F.2d 282, 292 (D.C.Cir.1991) (the FRA is intended to guarantee that agencies' records management programs "strike a balance 'between developing efficient and effective records management, and the substantive need for Federal records' ").

ords may be "alienated or destroyed" except in accordance with the FRA's provisions. *See* 44 U.S.C. § 3314. If a document qualifies as a record, the FRA prohibits an agency from "discarding it by fiat." *Armstrong II*, 1 F.3d at 1278 (citing *American Friends Serv. Comm. v. Webster*, 720 F.2d 29, 62 (D.C.Cir. 1983) ("Congress did not intend to grant [the agency] . . . a blank check for records disposal.")). Rather, the Records Disposal Act (the "RDA"), 44 U.S.C. §§ 3301 *et seq.,*—a component of the FRA—requires the agency to procure the approval of the Archivist before disposing of any record. *See* 44 U.S.C. § 3303a. In evaluating records for preservation, the agency is to focus on whether the records have any administrative, legal or fiscal use to the agency, *see* Admin. Rec., Vol. VI at 2316–20 (National Archives and Records Administration ("NARA"), Records Management Handbook: Disposition of Federal Records (1992)), while the Archivist and his staff focus on whether the records have sufficient historic or research value to those outside the agency to warrant their preservation. *Id.* at 2319–20. If the Archivist determines that agency records do not hold administrative, legal, research or other value, he can authorize disposal of the records. 44 U.S.C. § 3303a(a), (d) and (e).

Under the system of individual agency schedules, an agency submits to the Archivist a "request for disposition authority" or a "disposition schedule" in which the agency identifies specific agency records and proposes that they be destroyed after the lapse of specified periods of time. 44 U.S.C. § 3303a(a); Scheduling Temporary Records, 36 C.F.R. § 1228.30 (1997). The Archivist then must issue a notice requesting public comment on the agency's proposal, and the Archivist's staff must assess the value of the records. The Archivist may accept or reject the agency's proposal. 44 U.S.C. § 3303a(a). If the Archivist finds that the records have sufficient value, the records eventually will be transferred to the Archives as "permanent" records. 44 U.S.C. § 2107. Otherwise, the Archivist will approve a schedule authorizing disposition of the records after they have been retained for an appropriate period of time. 44 U.S.C. § 3303a(a).[5]

As an alternative to individual agency schedules, Congress has authorized the Archivist to promulgate General Records Schedules governing the disposition of certain kinds of records only—records of a "specified form or character common to several or all agencies" that do not, "after a specified period of time" have sufficient administrative, legal, research or other value to warrant their continued preservation. 44 U.S.C. § 3303a(d).[6] The General Records Schedules "cover records documenting administrative, or housekeeping, functions rather than program functions." Admin. Rec., Vol. IV. at 2324 (NARA, Records Management Handbook: Disposition of Federal Records). To date, the Archivist has issued twenty-three General Records Schedules, covering the disposal of approximately one-third of the total volume of records created by federal agencies. Admin. Rec., Vol. III at 857 (Introduction to General Records Schedules, NARA Transmittal No. 7, August 1995).

In addition to his statutory responsibility to judge the suitability of records for dispos-

---

5. 44 U.S.C. § 3303a(a) states in full:

The Archivist shall examine the lists and schedules submitted to him under section 3303 of this title. If the Archivist determines that any of the records listed in a list or schedule submitted to him do not, or will not after the lapse of the period specified, have sufficient administrative, legal, research, or other value to warrant their continued preservation by the Government, he may, after publication of notice in the Federal Register and an opportunity for interested persons to submit comment thereon—
    (1) notify the agency to that effect; and

(2) empower the agency to dispose of those records in accordance with regulations promulgated under section 3302 of this title.

6. 44 U.S.C. § 3303a(d) states in full:
    The Archivist shall promulgate schedules authorizing the disposal, after the lapse of specified periods of time, of records of a specified form or character common to several or all agencies if such records will not, at the end of the periods specified, have sufficient administrative, legal, research, or other value to warrant their further preservation by the United States Government. A Federal agency may request changes in such schedules for its records pursuant to section 2909 of this title.

al, under the FRA the Archivist must also (1) "provide guidance and assistance to Federal agencies with respect to ensuring adequate and proper documentation of the policies and transactions of the Federal Government and ensuring proper records disposition," 44 U.S.C. § 2904(a); (2) "promulgate standards, procedures, and guidelines with respect to records management," 44 U.S.C. § 2904(c)(1); and (3) "conduct inspections or surveys of the records and the records management programs within and between Federal agencies." 44 U.S.C. § 2904(c)(7).

The Archivist plays "a key role" in the FRA's enforcement scheme. *Armstrong II*, 1 F.3d at 1279. If he discovers that an FRA provision has been or is being breached, the Archivist must (1) inform the agency head of the violation and suggest corrections, and (2) if ameliorative measures are not undertaken by the agency within a reasonable time, submit a written report to Congress and the President. 44 U.S.C. § 2115(b). In addition, if the Archivist discovers any "actual, impending, or threatened unlawful removal, defacing, alteration, or destruction of records in the custody of [an] agency," he must notify the agency head and assist him or her in initiating an action through the Attorney General for the recovery of wrongfully removed records or for other legal redress. 44 U.S.C. § 2905(a); *see also* 44 U.S.C. § 3106 (requiring agency heads to notify the Archivist of any unlawful destruction or removal of records and placing upon them an independent duty to seek legal action through the Attorney General to recover the records). If the agency head is recalcitrant in pursuing legal remedies, the Archivist himself is to (1) request the Attorney General to initiate action and (2) inform Congress that he has made that request. 44 U.S.C. § 2905(a). *See Armstrong II*, 1 F.3d at 1279 (citing 44 U.S.C. § 2905(a)); *see also Armstrong I*, 924 F.2d at 295 ("if the agency head or Archivist does nothing while an agency official destroys or removes records in contravention of agency guidelines and directives, private litigants may bring suit to require the agency head and Archivist to fulfill their statutory duty to notify Congress and ask the Attorney General to initiate legal action").

## III. DEFENDANTS' MOTION TO DISMISS

### A. Plaintiffs Have Standing

■ Article III standing requires that a plaintiff have suffered (1) an "injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical"—(2) which is "fairly traceable" to the challenged act, and (3) is "likely" to be "redressed by a favorable decision." *National Treasury Employees Union v. United States*, 101 F.3d 1423, 1427 (D.C.Cir.1996) (*quoting Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). These requirements apply to individual plaintiffs, as well as to organizations asserting standing to sue either on their own behalf or on behalf of their members. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982).[7]

### 1. Injury-in-fact

■ Plaintiffs in this case are historians, researchers and journalists who conduct research using government records made available under the Freedom of Information Act, 5 U.S.C. § 552,[8] or in the collections of the National Archives and Records Administration; and libraries that provide the public with access to electronic records of the government.

The government claims that plaintiffs have not met the first prong of the standing test—injury-in-fact—because their interest in this case is "ideological and abstract." Because plaintiffs have not pointed to specific docu-

---

**7.** The government concedes that if plaintiffs have Article III standing prior precedent in this Circuit acknowledges that individuals and organizations in plaintiffs' position are within the "zone of interests" of the FRA and thus have met prudential standing requirements. Defs.' Mem. of Pts. & Authorities at 16 n.16.

**8.** Amended by the Electronic FOIA Amendments of 1996, P.L. 104–231, § 5, 104 Stat. 2422 (1996).

ments that will be unavailable to them as a result of GRS 20's implementation and have not sued to challenge outright destruction of particular records, the government argues that plaintiffs' alleged injuries are not concrete enough to constitute injury-in-fact. *See* Defs.' Mem. at 10–16.

The Court disagrees. The record contains ample evidence that the individual plaintiffs and members of the plaintiff organizations have been or will be directly harmed by the promulgation of GRS 20. For example, plaintiffs assert that specific research projects, for which plaintiff Scott Armstrong has made FOIA requests for electronic versions of government records, will be affected directly by GRS 20.[9] Mr. Armstrong is an author and journalist who has made numerous requests under the FOIA for government records in electronic form and, according to him, is a person who has reason to make future requests for such records for research projects on topics including U.S. national security policy from 1978 to the present; Saudi–U.S. relations; Cuba–U.S. relations; Middle East arms sales; U.S. nuclear posture and nuclear arms control; the Native Hawaiian Sovereignty Movement; and labor rights and anti-corruption efforts. Declaration of Scott Armstrong at ¶ 5 ("Armstrong Decl."). Mr. Armstrong points to specific Cabinet departments and components of the Executive Office of the President that have adopted the "print and delete" method of preserving e-mail and word processing records in accordance with GRS 20 and whose electronic records he has requested in the past and plans to request in the future. Armstrong Decl. ¶¶ 4–8. He further states that destruction of electronic versions of documents makes it more difficult to retrieve and manipulate documents he seeks under the FOIA. *Id.* ¶ 8.

The injuries to Mr. Armstrong's interests as researcher, author and journalist are concrete enough to constitute injury-in-fact. *See*

*American Friends Serv. Comm. v. Webster,* 720 F.2d at 46 (plaintiffs who had claimed a need for agency documents arising " 'out of their professions as historians, journalists, teachers, film writers, or attorneys' " had standing to challenge the Archivist's approval of individual agency disposition schedules where they had made past FOIA requests, had other requests pending and intended to request records from the agency in the future); *see also Competitive Enterprise Institute v. NHTSA,* 901 F.2d 107 (D.C.Cir.1990) (consumer group sufficiently demonstrated injury-in-fact by showing that federal agency's decision to reduce automobile fuel economy standards hampered consumer group's members' ability to purchase larger passenger vehicles).

Plaintiffs Scott Armstrong, Eddie Becker, the National Security Archive, Public Citizen and members of the Organization of American Historians have made FOIA requests for electronic documents in the past and intend to request records in electronic form in the future.[10] They have demonstrated through their declarations that they face a real risk that records will not be available to them in electronic form because of the implementation of GRS 20, even though the 1996 amendments to the FOIA specifically allow the plaintiffs to request records in electronic form. *See* 5 U.S.C. § 552(a)(4) (as amended by the Electronic FOIA Amendments of 1996, P.L. 104–231, § 5, 104 Stat. 2422 (1996)).[11] The Court concludes that the plaintiff historians, researchers, journalists and authors have sufficiently pled injury-in-fact. *See American Friends Serv. Comm. v. Webster,* 720 F.2d at 46.

The Court also finds that plaintiffs have sufficiently pled injury-in-fact to the members of the American Library Association ("ALA"), which will be directly and dramatically affected by the compliance of federal

---

9. *See* Pls.' Reply Mem. in Support of Pls.' Cross–Mot. for Summ. J. ("Pls.' Reply") at 3–4.

10. Armstrong Decl. ¶ 5; Declaration of Eddie Becker at ¶ 2; Declaration of Thomas S. Blanton, Director of the National Security Archive, at ¶ 4; Declaration of Christopher McGinn, Deputy

Director of Public Citizen's Global Trade Watch, at ¶ 4; Declaration of Philip L. Cantelon, member of the Organization of American Historians, at ¶ 4.

11. *See, e.g.,* Blanton Decl. ¶¶ 10–12, 14–15, 17–18; McGinn Decl. ¶¶ 4–8.

agencies with GRS 20.[12]  Many member libraries provide access to government records by (1) serving as depositories for government publications under the Government Printing Office's ("GPO") Federal Depository Library Program; (2) providing on-line access to government records; and (3) providing access to private collections, books, periodicals or other publications that contain government records.  Declaration of Elizabeth Martinez, Executive Director of the ALA, at ¶ 7 ("Martinez Decl.").  Many Federal Depository Libraries provide public users with computer work stations that are able to access government information via the World Wide Web, and the GPO has opened 41 gateways in Depository Libraries to give the public access to many federal documents via an Internet connection.  *Id.* ¶¶ 8–9.  Some ALA members are also responsible for establishing archives of government records in electronic form, which the libraries then make available to the public on-line.  *Id.* ¶ 10.  The Martinez declaration demonstrates that many institutions and individuals will suffer distinct and palpable injury if government agencies are permitted to destroy pursuant to GRS 20 electronic versions of documents that have been preserved in paper or microfiche recordkeeping systems.

### 2.  *Redressability and Causation*

██  The government next asserts that striking down GRS 20 will not ensure that electronic versions of these records will be preserved in an electronic format, since agencies may destroy the electronic versions anyway under individual agency disposition

schedules.  Thus, it argues that a favorable ruling from this Court will not necessarily or even likely redress the injuries plaintiffs assert.  *See* Defs.' Mem. at 16–17.[13]

It is important to recognize that plaintiffs are not challenging the destruction of electronic records *per se.*  Plaintiffs acknowledge that if GRS 20 is struck down, the Archivist may still approve individual agency schedules authorizing the destruction of electronic mail and word processing records; they concede that destruction of some electronic records certainly will be necessary and practical.[14]  Plaintiffs only challenge the use of a General Record Schedule to schedule the destruction of electronic records, without distinguishing valuable electronic records from useless ones.  Thus, it is likely that a decision striking down GRS 20 would, in fact, fully address the plaintiffs' alleged injury.  *See Akins v. Federal Election Commission,* 101 F.3d 731, 738 (D.C.Cir.1996) (*en banc* ) (so long as error was one upon which challenged agency decision rests, injury to plaintiff is redressable by court, notwithstanding that agency might well "subsequently legitimately decide to reach the same result through different reasoning").  The Court therefore concludes that plaintiffs have standing.[15]

### B.  *Plaintiffs' Claim Against The USTR Is Not Moot*

██  Plaintiffs' second claim for relief involves the disposal of word processing records created by the Office of the United States Trade Representative ("USTR") from 1986 to 1992 and stored on backup tapes

**12.**  Although the Court finds injury-in-fact as to several plaintiffs, standing need only be established as to one in order for the case to go forward.  *Railway Labor Executives' Ass'n v. United States,* 987 F.2d 806, 810 (D.C.Cir.1993).

**13.**  The causation and redressability requirements of Article III "tend to merge" in a case like this where "the requested relief consists solely of the reversal or discontinuation of the challenged action."  *See Branton v. FCC,* 993 F.2d 906, 910 (D.C.Cir.1993).

**14.**  *See* Pls.' Mem. in Opp. to Defs.' Mot. To Dismiss or For Summ. J. and in Support of Pls.' Cross–Mot. for Summ. J. ("Pls. Mem.") at 18.

**15.**  *Branton v. FCC,* 993 F.2d 906, on which the government relies, is not persuasive authority to the contrary in the context of this case.  The

plaintiff in *Branton* could not meet the redressability standard because the relief he sought required third party radio stations over whom the court had no jurisdiction to stop broadcasting indecent material.  *Id.* at 911–12.  Branton failed to establish "some reason to believe that the level of broadcast indecency [by the nonparty radio stations] is significantly affected by the possibility of incurring an FCC sanction," and it therefore was mere speculation that plaintiff's harm would be redressed by court action against the FCC.  *Id.* at 912.  Here, by contrast, plaintiffs' injury stems from the fact that agencies are required to follow GRS–20; a ruling by this Court that GRS–20 is invalid would necessarily bind the agencies and would therefore redress plaintiffs' harm.

preserved pursuant to an injunction issued in *Armstrong II*. Compl. ¶¶ 65–68. Shortly after the complaint in this action was filed, the USTR received authority to withdraw a schedule under which the word processing records at issue would be destroyed.[16] The government asserts that the withdrawal of the schedule has rendered moot plaintiffs' second claim—a challenge to the USTR's right to destroy the enjoined documents pursuant to GRS 20. Defs.' Mem. at 41–43.

The Court is not convinced that there is no risk that the USTR documents at issue will be destroyed pursuant to GRS 20. First, the USTR still maintains that GRS 20 was properly propounded and will be upheld, Letter from General Counsel Jennifer Hillman to Archivist John Carlin (Defs.' Mem., Exh. A), at which time it would be free to renew its plans to destroy the records based on GRS 20. *See United States v. W.T. Grant Co.*, 345 U.S. 629, 632, 73 S.Ct. 894, 97 L.Ed. 1303 (1953) (holding that case is not moot when defendant voluntarily halts challenged practice but is free to resume conduct in future); *City of New York v. Baker*, 878 F.2d 507, 511–12 (D.C.Cir.1989). Second, General Records Schedules are mandatory, 44 U.S.C. § 3303a(b), and the USTR and other agencies are required to destroy records in accordance with the GRS 20 unless they submit a request for and receive an exception to the Schedule. General Records Schedules, Applicability, 36 C.F.R. § 1228.42(a) (1997). Because the USTR has made no such request for an exception, it is quite possible that the USTR may destroy documents pursuant to GRS 20 at some point in the future. Plaintiffs' second claim therefore is not moot.

### C. The EOP Is A Proper Party To This Lawsuit

■ The government argues that the Executive Office of the President is not a proper party to this lawsuit because it has no independent existence or functions, apart from those of its separate component parts. Rather, it maintains, the EOP functions sim-

ply as an "umbrella" designation for various separately designated components which operate in close proximity to the President. The government fears that having the EOP as a party may subject governmental entities not named in the complaint and not governed by the FRA to any injunctive relief ordered by the Court in this case. *See* Defs.' Mem. at 43–45.

The Court is unpersuaded by the government's argument. Because no individual record can be subject to both the FRA and the Presidential Records Act ("PRA"),[17] and because the PRA specifies that its coverage and the coverage of the FOIA are mutually exclusive,[18] the court of appeals for this Circuit has recognized that the FRA and the FOIA apply to the same set of records. *See Armstrong II*, 1 F.3d at 1293 (concluding that the set of records subject to the FOIA and the FRA and those subject to the PRA are mutually exclusive). As Judge Tatel later explained, the court of appeals has treated the term "agency" in the FRA as coterminous with the definition of "agency" in the FOIA because of the close relationship between the two statutes. *Armstrong v. Executive Office of the President ("Armstrong III")*, 90 F.3d 553, 567 (D.C.Cir.1996) (Tatel, J., dissenting). Thus, the Court looks to the FOIA to determine whether a governmental entity is an agency under the FRA.

Section 552(f) of the FOIA provides that the term "agency" includes

any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (*including the Executive Office of the President* ), or any independent regulatory agency.

5 U.S.C. § 552(f) (emphasis added). Since the Executive Office of the President is an agency for the purposes of the FOIA, it follows under *Armstrong II* that the EOP is an agency for purposes of the FRA as well.

---

16. *See* Letter from General Counsel Jennifer Hillman to ·Archivist John Carlin (Jan. 14, 1997) (Defs.' Mem., Exh. A); Letter from Archivist John Carlin to USTR Charlene Barshefsky (Jan. 15, 1997) (Defs.' Mem., Exh. B).

17. 44 U.S.C. §§ 2201–07; *see Armstrong II*, 1 F.3d at 1293.

18. *See* 44 U.S.C. § 2201(2)(B).

The EOP's status as an agency is also evidenced by the authority it possesses to impose requirements on all of the EOP components in certain matters. Most significantly, the preparation of records disposition schedules is not handled separately by EOP components, but is centralized in the EOP.[19] While the government may be correct in its assertion that the Office of Administration administers records disposition schedules on behalf of the EOP agency components, it is clear from the EOP's records schedules that the administration of records is handled by and on behalf of the EOP as a single entity. Records schedules identify the EOP as an agency and are signed by an Office of Administration official with the title of "EOP Records Management Officer." *See, e.g.,* Request for Records Disposition Authority, Pls.' Mem., App. at P238. The EOP therefore is a proper party to this lawsuit.

Maintaining the EOP as a defendant in this litigation will not affect components of the EOP that are not governed by the FRA. The term "agency" under the FOIA and the FRA "is not interpreted as including the President's immediate staff or units in the [EOP] whose sole function is to advise and assist the President." H.R.Rep. No. 95–1487, at 11 (1978) (*quoted in Armstrong II,* 1 F.3d at 1295); *see Armstrong III,* 90 F.3d at 567–68 (Tatel, J., dissenting). It should be clear to those components traditionally governed by the PRA therefore that they are not implicated in this action, which involves a General Records Schedule promulgated pursuant to the FRA.

## IV. THE CROSS–MOTIONS FOR SUMMARY JUDGMENT

### A. *Standard of Review*

The Supreme Court has held that the Federal Records Act and the Records Disposal Act do not confer a private right of action to sue directly under those statutes to prevent the destruction or removal of records. *Kissinger v. Reporters Comm. for Freedom of the Press,* 445 U.S. 136, 149, 100 S.Ct. 960, 63 L.Ed.2d 267 (1980). While judicial review is precluded to the extent that allegations are made that agency officials are not acting in compliance with their duties under record-keeping guidelines, the Court has a role to play in reviewing the guidelines themselves under the APA. *See American Friends Serv. Comm. v. Webster,* 720 F.2d at 59; *cf. Armstrong I,* 924 F.2d at 291, 294–95. Under the APA, the Court may set aside GRS–20 in this case only if it is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2). That analysis requires a court to address two separate questions: (1) whether the Archivist "properly interpreted [his] statutory responsibilities—whether [his] actions were 'in accordance with the law;'" and (2) whether the agency actions taken under the statutory authority are 'arbitrary and capricious.' *See American Friends Serv. Comm. v. Webster,* 720 F.2d at 59 (*quoting* 5 U.S.C. § 706(2)(A)). In this case, the Court concludes that in promulgating GRS 20 the Archivist did not properly interpret his responsibilities under the FRA.[20]

### B. *The Archivist Exceeded the Scope of His Statutory Authority in Promulgating GRS–20*

Section 3303a(d) of the Records Disposal Act permits the Archivist to promulgate general schedules "authorizing the disposal, [1] after a lapse of specified periods of time, [2] of records of a specified form or character common to several or all agencies [3] if such records will not, at the end of the periods

---

**19.** *See* EOP, Records Management Program, Federal Records Creation, Maintenance, and Disposition Manual, Pls.' Mem., App. at P316–17; *Armstrong II,* CA No. 89–142, Dep. of Mary Hester Anton, Dir. of Library and Information Services, Office of Administration, Executive Office of the President, January 8, 1992 (Pls.' Mem., App. at 282–99).

**20.** Review under the APA generally is limited to the administrative record presented by the agency to the reviewing court. *Florida Power & Light*

*Co. v. Lorion,* 470 U.S. 729, 743–44, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985). In this case, however, the Court has allowed the administrative record to be supplemented to a limited extent. *See* Order (July 3, 1997) (citing *San Luis Obispo Mothers for Peace v. Nuclear Regulatory Comm.,* 751 F.2d 1287, 1327 (D.C.Cir.1984), *vacated in part,* 760 F.2d 1320 (1985), *aff'd,* 789 F.2d 26 (D.C.Cir., *cert. denied,* 479 U.S. 923, 107 S.Ct. 330, 93 L.Ed.2d 302 (1986))).

specified, have sufficient administrative, legal, research, or other value to warrant their preservation by the United States Government." 44 U.S.C. § 3303a(d).

The Court concludes that in promulgating GRS 20 the Archivist exceeded his authority under Section 3303a(d) of the Records Disposal Act in at least three respects. First, in promulgating GRS 20 he has allowed for the destruction of "program" records of federal government agencies through the use of a General Records Schedule, an action which exceeds the limits Congress placed on the use of general schedules when it enacted Section 3303a(d). Second, the Archivist has abdicated to the various departments and agencies of the federal government his statutory responsibility under the Records Disposal Act to insure that records with administrative, legal, research or other value are preserved by federal agencies. Third, in promulgating GRS 20 he violated the Records Disposal Act by failing to identify a specified period of time for retention for the records scheduled.

1. The Records Disposal Act Does Not Authorize Destruction of "Program" Records through a General Records Schedule

a. Congress intended General Records Schedules to cover administrative, not program records [21]

■ Congress first authorized the use of General Records Schedules as a method of disposing of federal records in 1943. The statute enacted then provided:

> The head of each agency of the United States Government shall submit to the Archivist of the United States ... schedules proposing the disposal after the lapse of specified periods of time of records of a specified form or character that either have accumulated in the custody of the agency or that may accumulate therein at any time after the submission of such schedules and that apparently will not af-

ter the lapse of the period specified have sufficient administrative, legal, research, or other value to warrant their further preservation by the Government.

Disposal of Certain Government Records, ch. 192, sec. 3, 57 Stat. 381 (1943). The statute was amended in 1945 specifically to transfer the authority to promulgate General Records Schedules from the heads of the individual agencies to the Archivist and to require that the records be of a form or character common to several or all agencies. Pub.L. 79–133, 59 Stat. 434 (1945). Today, the statute still requires that General Records Schedules be limited to records "of a specified form or character common to several or all agencies" and that the Archivist him or herself promulgate the General Records Schedules. 44 U.S.C. § 3303a(d).

The RDA itself does not provide a definition for the term "records of a specified form or character common to several or all agencies." The Court therefore must look beyond the language of the statute to determine what records Congress intended be covered by General Records Schedules. The RDA's legislative history shows that both houses of Congress contemplated that General Records Schedules would be used only for "routine 'housekeeping records,' such as those relating to the hiring of personnel, procurement of supplies, and fiscal management, that are common to many agencies." H.R.Rep. No. 79–361 at 1 (1945); S.Rep. No. 79–447 at 1 (1945). When Congress amended Section 3303a(d) in 1978 to make the use of General Records Schedules mandatory, the Committee on House Administration assured Congress that "[i]f records are unique to an agency they would not be affected by" the mandatory General Records Schedules. H.R.Rep. No. 95–1263 at 1–2, *reprinted in* 1978 U.S.C.C.A.N. 2623, 2624. The Committee also reaffirmed that General Records Schedules were to cover the "disposal of routine agency records in such areas as personnel, payroll, procurement and supply." *Id.* at 1, 1978 U.S.C.C.A.N. 2623, 2624.

---

**21.** In contrast to the "housekeeping" or "facilitative" character of administrative records, "program records," as defined by the National Archives and Records Administration ("NARA"), are "[r]ecords created or received and main-

tained by an agency in the conduct of the substantive functions for which it is responsible." Admin. Rec., Vol. VI at 2403, 2413 (NARA, Records Management Handbook: Disposition of Federal Records, App. D., Glossary).

Following Congress' directive, the National Archives and Records Administration and its predecessor, the General Services Administration ("GSA"), consistently have instructed federal agencies to use General Records Schedules for "administrative" records, not for "program" records. *See, e.g.,* Admin. Rec., Vol. IV. at 2324 (NARA, Records Management Handbook: Disposition of Federal Records (1992)); NARA, Records Management Handbook: Disposition of Federal Records 28 (1981) (Pls.' Mem., App.); NARA, Records Management Handbook: Disposition of Federal Records 26 (1978) (Pls.' Mem., App.). As the current NARA Records Management Handbook notes, "[t]he GRS covers records documenting administrative, or housekeeping functions rather than program functions." Admin. Rec., Vol. VI at 2324 (NARA, Records Management Handbook: Disposition of Federal Records). Other NARA documents state that General Records Schedules should not be used for administrative records that are "mixed with program records." Admin. Rec., Vol. III at 857 (Introduction to General Records Schedules, NARA Transmittal No. 7, August 1995).[22] If mixed administrative and program records cannot be "economically segregated," the entire file should be kept for the period of time approved for the program records. *Id.*

Given the legislative history of Section 3303a(d) regarding the scope of General Records Schedules, it is not surprising that every general records schedule promulgated to date, except GRS 20, covers administrative housekeeping records common to all agencies.[23] Even the few general schedules that on their face seem to cover both housekeeping and program records are careful to exclude program records from their scope. For example, GRS 17, which schedules the disposal of cartographic, aerial photographic, architectural and engineering records, and GRS 21, covering audiovisual records, specifically provide that separate NARA guidelines for managing the categories of records covered by the two schedules must be used in conjunction with GRS 17 and GRS 21 to insure proper disposition of all such records. Admin. Rec., Vol. III at 963, 990 (Introductions to GRS 17 and 21). GRS 18, covering security and protective services records, excludes from its authority records documenting government wide or agency wide security and protective services planning and programming that reflect overall policies and determinations. Admin. Rec., Vol. III at 967 (Introduction to GRS 18). GRS 19 was rescinded after NARA concluded that research and development records should not be governed by a GRS, due to their varied nature. Admin. Rec., Vol. III at 980 (GRS 19).

The government nevertheless asserts that Congress did not intend to limit General Records Schedules to records documenting housekeeping functions and argues that the term "specified form or character" in Section 3303a(d) should be construed more broadly to include records of a common medium. The government maintains that the term "form or character" in Section 3303a(d) was intended to be read in the same way as the term "form or characteristic" found in Sec-

---

**22.** *See also* Pls.' Mem., App. at P60 (Introduction to General Records Schedules, June 1988); Pls.' Mem., App. at P62 (Introduction to General Records Schedules, NARA Transmittal No. 2, October 30 1989).

**23.** Records covered by the GRS series include the following: civilian personnel records (GRS 1); payrolling and pay administration records (GRS 2); procurement, supply and grant records (GRS 3); property disposal records (GRS 4); budget preparation, presentation and apportionment records (GRS 5); accountable officers' accounts records (GRS 6) and expenditure accounting records (GRS 7); stores, plant and cost accounting records (GRS 8); travel and transportation records (GRS 9); motor vehicle maintenance and operations records (GRS 10); space

and maintenance records (GRS 11); communications records (GRS 12); printing, binding, duplication and distribution records (GRS 13); information services records (GRS 14); housing records (GRS 15); administrative management records (GRS 16); cartographic, aerial photographic, architectural, and engineering records (GRS 17); security and protective services records (GRS 18); electronic records (GRS 20); audiovisual records (GRS 21); inspector general records (GRS 22); and "records common to most offices within agencies" (GRS 23). GRS 19, covering research and development records, was rescinded. Admin. Rec., Vol. III at 859–1001 (General Records Schedules 1–23, NARA Transmittal No. 7, August 1995).

tion 3301. In Section 3301, Congress defined a federal record as not being limited by "physical *form or characteristic*," 44 U.S.C. § 3301 (emphasis added), and NARA has sought to clarify the definition of the term "federal record" by stating that "the medium [of a record] may be paper, film, disk, or other physical type or form; and that the *method of recording* may be manual, mechanical, photographic, *electronic* or any other combination of these or other technologies," 36 C.F.R. § 1222.12(b)(2) (1997) (emphasis added). The government infers from Section 3301 and NARA's regulation that "form or characteristic" in Section 3301, and, in turn, "form or character" in Section 3303a(d) can refer to the medium of a record. Under the government's theory, it follows that all records created on electronic media, such as electronic communication or word processing systems, are "records of a specified form or character common to several or all agencies," and thus may be scheduled pursuant to Section 3303a(d). *See* Defs.' Mem. at 22–23.

The government's interpretation of Section 3303a(d) not only contradicts the clear intent of Congress, but is irrational on its face. The general schedules were designed to handle records that document housekeeping functions, procedures and transactions, such as personnel, maintenance or procurement, not unique aspects of a given agency. The routine nature of these kinds of records makes them both of a character common to multiple agencies, and also of lesser value. *See* NARA, Records Management Handbook: Disposition of Federal Records 28 (1981) (Pls.' Mem., App.) ("General records schedules are based upon the following premises: . . . . The records have the same values, regardless of the agency that creates them."); NARA, Records Management Handbook: Disposition of Federal Records 26 (1978) (Pls.' Mem., App.) (same). Thus, there is a relationship between the commonality of rec-

ords covered by a general schedule and their diminished value.

■ The common feature of the records scheduled under GRS 20—the fact that they have been generated by electronic technology—has no relation to each record's value. No one would argue, for example, that a cable from the Secretary of State to an Ambassador at a U.S. Embassy abroad about an impending crisis or an electronic mail message written by the Secretary of State regarding the President's decision to declare war on another country has the same value as a GSA word processing file regarding procurement of desks, simply because both records were created by electronic technology. Unlike the GSA record, the Secretary of State's cable or electronic mail message documents unique and important operations of government that may have historic value. The Archivist should not use the same disposal criteria applied to the GSA procurement document on the Secretary's message just because both records are found in computers.

The government surely would not argue that Section 3303a(d) gives the Archivist authority to schedule the disposal of all handwritten records for disposal once their contents have been preserved in electronic or microfiche recordkeeping systems, simply because handwritten documents are created by a method common to all agencies.[24] A schedule that would include all handwritten documents would be inconsistent with the limited purpose of general schedules to provide an efficient method of disposing of records common to several or all agencies that do not possess long-term value. For the same reasons, it is inconsistent with the limited purpose of General Records Schedules to schedule all electronic records simply because they were created or stored on government computers. Simply put, Congress did not intend that records of such disparate value be

---

24. The government points to differences between handwritten and electronic records that explain why the disposition of electronic records should be handled through general schedules and the disposition of handwritten documents should not. Defs.' Reply Mem. in Support of Defs.' Mot. to Dismiss, or in the Alternative, for Summ. J. and in Opp. to Pls.' Cross–Mot. for Summ. J.

("Defs.' Reply") at 8. The government's argument, however, fails to address the troubling consequences of its interpretation of Section 3303a(d). Whether or not it is wise to schedule all handwritten records under a General Records Schedule, the government's interpretation of Section 3303a(d) would allow the Archivist to do just that. .

lumped together under one disposition schedule. Such a method for disposing of records is not consistent with the responsibility placed on the Archivist to insure the protection and preservation of valuable government records.

In sum, the RDA and its legislative history, NARA's own statements and the general schedules themselves leave little doubt that Congress intended general schedules to cover only administrative records, and not records relating to the substantive functions for which agencies are responsible, program records.

b. Electronic records do not lose their status as "program records" once they are preserved on paper

■ The government asserts that even if the RDA does not authorize the use of general schedules to dispose of program records, the Archivist has not exceeded his authority under the Act in promulgating GRS 20. It maintains that once all the information from an electronic record has been preserved in a paper, microfiche or other recordkeeping system (as required under GRS 20), and separately scheduled in accordance with agency disposition schedules submitted under 44 U.S.C. § 3303a(a), the original electronic version of that record is essentially a duplicate of the preserved copy and may be routinely destroyed. According to the government, it only possesses "temporary" value and therefore falls within the definition of "housekeeping" records as that term is understood for purposes of the RDA. Defs.' Mem. at 25–27.[25] The government claims that this understanding of the Archivist's authority under the RDA is consistent with the intent of Congress and in accord with longstanding regulatory guidance provided to agencies by the Archivist concerning the intrinsic value of copies of records once the information contained in the records has been retained elsewhere. *Id.* at 26.

The government's argument is reminiscent of its earlier argument rejected by the court of appeals in *Armstrong II*, that electronic documents, once copied to paper, were no longer "records." *Armstrong II*, 1 F.3d at 1285. In *Armstrong II*, the court of appeals determined that an electronic message was a record required to be scheduled under the FRA unless it was an *identical* "extra cop[y] ... preserved only for convenience of reference." *Id.* at 1284–85. The court also concluded that paper print-outs of electronic mail did not generally contain all the information in the electronic original and therefore were not exact duplicates of the electronic versions. Because "the electronic documents retain their status as federal records after the creation of the paper print-outs, ... all the FRA obligations concerning the management and preservation of records still apply." *Armstrong II*, 1 F.3d at 1283. As Judge Wald stated for the court, paper printouts that do not contain "all significant material" contained in the electronic records "cannot accurately be termed 'copies'—identical twins—but are, at most, 'kissing cousins.'" *Id.* at 1283. The court therefore concluded that electronic messages do not lose their status as records once they have been printed on paper. *Id.*

Although the government no longer argues that the process of printing out an electronic record takes away its status as a record, it now argues that the creation of a paper version of an electronic record takes away the electronic version's long-term value and, in turn, its status as a "program" record. Defs.' Mem. at 23–30. This argument is no more persuasive than the one rejected by the court of appeals in *Armstrong II*. While an *exact* duplicate of a particular record might be discardable, electronic versions of records cannot categorically be regarded as valueless "extra copies" of paper versions. *See Armstrong II*, 1 F.3d at 1283, 1285. Simply put, electronic communications are rarely identical to their paper counterparts; they are

**25.** For this proposition, the government cites only the testimony of Dr. James E. O'Neill, Deputy Archivist of the United States before a House Subcommittee in 1977. *See Hearing before Subcomm. on Civil Service and General Services of the Comm. on Governmental Affairs*, 95th Cong., 1st Sess. 17 (1977) (testimony of Dr. James E. O'Neill, Deputy Archivist of the U.S.) ("records of a common nature" covered by the GRS series are "usually" housekeeping records of the agency, where "[t]he information contained in the record either has a very short life, is not worth preserving, or that information is incorporated in some more permanent record").

records unique and distinct from printed versions of the same record. *Id.* at 1285.

While GRS 20 addressed the court of appeals' specific concerns in *Armstrong II* by requiring that dates of transmission or receipt and the names of sender and recipients be preserved elsewhere before the electronic version of an electronic mail message is destroyed, Admin. Rec., Vol. III at 989 (GRS 20, Item 14), the administrative record in this case demonstrates that electronic records often have a number of other unique and valuable features not found in the paper print-outs of the records. For example, records in electronic recordkeeping systems have searching, manipulating and indexing capabilities not found in paper records, an advantage recognized by NARA itself. *See* Notice of Issuance of General Records Schedule, 60 Fed.Reg. at 44,643. In addition, electronic records can be transmitted over telephone or communication lines and therefore can be distributed or made available to the public more readily than paper copies.[26] Finally and most importantly, electronic records often contain information that is not preserved in a print-out record or even in other computerized systems of records.[27]

For example, paper print-outs of computer spreadsheets only display the results of calculations made on the spreadsheet, while the actual electronic version of the spreadsheet will show the formula used to make the calculations. Admin. Rec., Vol. I at 205 (Comments of Public Citizen on NARA Proposal to Revise General Records Schedule 20). Some word processing systems allow users to annotate a document with "a summary" or "comments" that contain informa-

tion on the author of the document, its purpose, the date that it was drafted or revised, and annotations by authors or reviewers. *See* Becker Decl. ¶¶ 4–6. These comments, however, usually do not appear on a printed copy of the record. *Id.* ¶ 7. Such differences between electronic and paper records illustrate the fact that the administrative, legal, research and historical value of electronic records is not always fully captured—indeed, is usually not captured—by paper or microfiche copies. Electronic records therefore do not become valueless duplicates or lose their character as "program records" once they have been printed on paper; rather, they retain features unique to their medium.

Because agencies are not required to determine if a scheduled record is a program record, it is inevitable that program records copied to paper will be destroyed under GRS 20. As the Court has explained, such a result would violate the intent of Congress, which unequivocally limited the scope of general schedules to administrative records. For this reason, too, the Court concludes that the promulgation of GRS 20 violated the Archivist's authority under Section 3303a(d).

2. Under GRS 20, the Archivist Fails to Carry Out his Statutory Duty to Evaluate the Value of Records Scheduled for Disposal

■ Congress "intended, expected and positively desired private researchers ... to have access to the documentary history of the federal government." *American Friends Serv. Comm. v. Webster*, 720 F.2d at 57. In furtherance of that goal, Congress gave the

---

26. NARA itself has acknowledged this advantage of electronic records:

> The electronic format may also allow simultaneous use by multiple staff members and may provide a more efficient method to store records. Furthermore, when they are no longer needed by the creating agency, access by future researchers to permanently valuable electronic records would be enhanced by electronic preservation.

NARA, Final Rule, 60 Fed.Reg. 44,634, 44,639 (1995).

27. Obviously not typical but nevertheless illustrative are the so-called PROF notes, computerized messages between Admiral Poindexter and Colo-

nel North that played an important role in the trials of both Poindexter and North. *See* Final Report of the Independent Counsel for Iran/Contra Matters, Vol. I at 124. Admiral Poindexter, a computer expert, set up a special channel, known as "Private Blank Check," which allowed North and Poindexter to relay messages to each other without those messages being routed through channels accessible to other NSC staff. The communication itself was clearly important to investigators, but the mode of communication and the special channel through which it was sent, which would not have been reflected in paper printouts of the messages, was also important.

Archivist and his staff primary responsibility for ensuring that historical and other valuable records are not destroyed by federal government entities. *See* Act of June 23, 1970, Pub.L. No. 91–287, § 2, 84 Stat. 320, 321–22 (1971) (giving sole approval authority over the disposal of records to NARA).

Congress was aware that "agencies, left to themselves, have a built-in incentive to dispose of records relating to [their] 'mistakes' . . . ." *American Friends Serv. Comm. v. Webster,* 720 F.2d at 41. Thus, Congress directed the Archivist and his staff not only to work with the agencies to develop appropriate record management procedures, but also to oversee the activities of federal agencies to ensure that the nation's documentary history is preserved for the public. *See* 44 U.S.C. § 2902(1) (listing first among the Act's goals the "[a]ccurate and complete documentation of the policies and transactions of the Federal Government"); *see also Armstrong I,* 924 F.2d at 288 (noting the "expressed statutory goal of preserving records for historical purposes").

The Archivist's oversight responsibilities are nowhere more evident than in the RDA, which carefully limits agency discretion in destroying records by requiring the Archivist to approve any determination that a record should be scheduled for destruction because it lacks sufficient administrative, legal, research or other value to warrant continued preservation. Under the RDA, an agency may submit a schedule of records sought to be discarded to the Archivist, but only the Archivist can approve the records' destruction and can do so only if he concludes that they do not have "sufficient administrative, legal, research, or other value to warrant their continued preservation." 44 U.S.C. § 3303a(a).[28] While an agency may discard certain common types of records pursuant to General Records Schedules promulgated by the Archivist in advance, even then the Archivist makes the final determination that records scheduled for destruction do not possess sufficient value to warrant continued

preservation. 44 U.S.C. § 3303a(d); *Armstrong II,* 1 F.3d at 1279.

In promulgating GRS 20, the Archivist has failed to carry out his duties under Section 3303a(d). He has made no determination that the records scheduled under GRS 20 lack sufficient administrative, legal, research or other value to warrant continued preservation. 44 U.S.C. § 3303a(d). Rather, he implicitly determined that no electronic records have sufficient administrative, legal, research or other value to warrant continued preservation once copies of such records are placed in paper, microfiche or electronic recordkeeping systems. This is an irrational determination, and one that is necessarily premised on the illogical notion that a paper copy adequately preserves the value of an electronic record. While, in some cases, paper copies may in fact adequately preserve the administrative, legal, research or historical value of an electronic record, there is no rational basis for the Archivist's conclusion that a paper copy invariably adequately preserves such value in *all* cases and that electronic records never retain any administrative, legal, research or other value once such records have been copied to paper.

By categorically determining that electronic records possess no administrative, legal, research or historical value beyond paper print-outs of the same document or record, the Archivist has absolved both himself and the federal agencies he is supposed to oversee of their statutory duties to evaluate specific electronic records as to their value. The Archivist has also given agencies carte blanche to destroy electronic versions without the Archivist's approval when the agency believes they are no longer needed by the agency. Because GRS 20 leaves the destruction of electronic versions of records unchecked by the Archivist, it fails to meet the requirements of Section 3303a(d).

3. GRS 20 Violates Section 3303a(d) Because It Does Not Specify the Period for Retention of Records

In addition to its other requirements, Section 3303a(d) of the Records Dis-

---

**28.** *See Armstrong II,* 1 F.3d at 1287 (acknowledging agencies' ability to "purge incidental electronic records from their files by acting, *with the Archivist's approval,* to dispose of those docu-

ments that lack 'sufficient administrative, legal, research, or other value to warrant their continued preservation' ") (emphasis in original).

posal Act permits the Archivist to authorize disposal of records under a general schedule only "after a lapse of specified periods of time" and only if such records will not "at the end of the periods specified" have sufficient value to warrant preservation. 44 U.S.C. § 3303a(d). In promulgating GRS 20, the Archivist exceeded his authority under Section 3303a(d) by failing to specify any periods of time for retaining records scheduled under GRS 20. Rather, the schedule provides that an agency should delete word processing files when the agency believes that they are "no longer needed for updating or revision," and electronic mail records "after copying to a recordkeeping system." Admin. Rec., Vol. III at 988–989 (GRS 20, Items 13 and 14). In fact, the introduction to GRS 20 states that

> NARA cannot establish a more specific retention that would be appropriate in all applications. Each agency should, when appropriate, determine a more specific disposition instruction, such as "Delete after X update cycles" or "Delete when X years old," for inclusion in its records directives or manuals. NARA approval is not needed to set retention periods for records in the GRS that are authorized for destruction when no longer needed.

*Id.* at 981 (GRS 20).

GRS 20's failure to specify a retention period violates the plain language and the purpose of the RDA. The language and structure of Section 3303a(d) make clear that "specified period" refers to an explicit identifiable period of time, a period of months or years: The Archivist may authorize disposal after "the lapse of specified periods of time . . . if such records will not, at the end of the periods specified" have sufficient value to warrant preservation. 44 U.S.C. § 3303a(d). Congress intended by this language that a specified retention period be set forth in each general schedule in order to bring uniformity across federal agencies as to the particular records covered by the schedule, not that each agency be left to its own devices. *See* S.Rep. No. 91–914, at 3 (1970), *reprinted in*

1970 U.S.C.C.A.N. 3297, 3299 (GSA comments) ("[g]eneral schedules authorize[ ] all agencies of Government to dispose of similar classes of useless records, for example, personnel and accounting records, on a uniform basis, . . . *and make retention periods for these records uniform throughout the Government*") (emphasis added). By requiring agencies to dispose of useless records after a defined time period, Congress intended to insulate the "regular and rapid elimination of useless papers" from the vagaries of individual agencies. H.R.Rep. No. 78–559 at 4 (comments of Treasury Department that general schedules facilitate a more "regular and rapid elimination of useless papers").

Leaving to the agency the decision of "when" to discard records turns Section 3303a(d) on its head. Under GRS 20, an agency's decision to dispose of records determines the records' retention period. But Congress intended just the opposite—that the lapse of a specified retention period, along with a determination by the Archivist, in advance, that the records will not possess value in the future, would govern when the records may be destroyed. The RDA unequivocally requires the Archivist's approval over any schedule submitted by, or imposed upon, a federal agency. *See* 44 U.S.C. § 3303a. The Archivist's failure to set a specified retention period in GRS 20 essentially removes the Archivist as a check on the destruction of electronic records.

While the vast majority of the hundreds of items in general schedules have specific retention periods, *see* Admin. Rec., Vol. III at 859–1001 (GRS 1–23), and leave little or no discretion in the agencies, the government correctly points out that GRS 20 does not stand alone and that in approximately thirty items throughout other general schedules the Archivist directs agencies to delete records "when no longer needed."[29] Like GRS 20, these items place the decision of when to destroy records entirely in the hands of the agencies. Such unbridled discretion is not consonant with the purpose of the mandatory

---

29. *See, e.g.,* Admin. Rec., Vol. III at 861 (GRS 1, Item 4); *Id.* at 925–26 (GRS 9, Items 1 & 5); *Id.* at 955 (GRS 16, Item 2b); *Id.* at 959 (GRS 16, Item 10b); *Id.* at 961 (GRS 16, Item 14e); *Id.* at 963–67 (GRS 17, Items 1–10); *Id.* at 991–94 (GRS 21, Items 4, 7, 10, 11, 13, 15, 18, 20, 21, 25 & 27); *Id.* at 999 (GRS 23, Item 5b); *Id.* at 1001 (GRS 23, Items 8 & 9).

general schedules and the intent of Congress. This case, however, is only a challenge to certain items in GRS 20, and the propriety of the other items is not an issue before this Court.[30]

### C. The Court's Ruling Will Not Hamper the Efforts of Federal Government Records Managers To Effectively Manage Electronic Records

Although the Court holds that the Archivist exceeded his authority under Section 3303a(d) in promulgating GRS 20, the Court is careful to note that the government still has broad authority to schedule electronic records under Section 3303a.

First, federal agencies can submit to the Archivist individual agency schedules covering electronic records, which then would be reviewed by the Archivist to ensure that the scheduled electronic records will not possess administrative, legal, research or other value after the proposed specified retention period. 44 U.S.C. § 3303a(a). Second, the Archivist has authority to promulgate general schedules covering electronic records that document housekeeping functions of federal agencies. 44 U.S.C. § 3303a(d). Finally, the Court's decision does not touch upon the Archivist's authority to dispose of records in his own legal custody, pursuant to Section 3303a(e). 44 U.S.C. § 3303a(e).

The government raises an important concern that many agencies do not have the capability at this time to preserve electronic records on electronic recordkeeping systems. Furthermore, storing electronic records on "live" computer systems is often not an effective way of preserving such records. Not only does storing files on live systems waste valuable computer memory, but, the government maintains, it is difficult to manipulate, search and index electronic records unless they are on electronic recordkeeping systems.

The solution to this problem is not to absolve all agencies of using electronic recordkeeping systems because some agencies do not now have the capability to do so. Rather, it makes much more sense to require each agency to put forward its best records management strategy, taking into account its particular assets and deficiencies. Given that Congress established General Records Schedules, in large part, "to conserve space and filing equipment," [31] the Archivist and NARA should be promulgating general schedules that encourage and prod agencies to establish space-saving electronic recordkeeping systems. While, as the government points out, "the day of the paperless office has not yet arrived," Def.'s Mem. at 33, computers have now become a significant part of the way the federal government conducts its business. The federal government must adapt its electronic recordkeeping capabilities to reflect that reality.

For many years, Congress has recognized the importance of maintaining certain types of government records and has established safeguards to insure that records with sufficient administrative, legal, research or other value are not destroyed. It should come as no surprise that electronic records, which take less storage space than paper records, should be subject to the same safeguards. While Congress has given the Archivist an enormous task in managing the federal government's records, the Court is confident that the Archivist will be able to efficiently dispose of electronic records within the structure provided by existing law.

### V. CONCLUSION

For the foregoing reasons, plaintiffs' Motion for Summary Judgment is granted and defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment is denied. An Order consistent with this Opinion is entered this same day.

SO ORDERED.

---

**30.** In addition, these other general schedules appear to give discretion to agencies over discrete sets of routine, housekeeping documents, while GRS 20 gives the agencies discretion over a wide array of program *and* housekeeping records, having a potential impact on documents stored on every computer used by the federal government.

**31.** H.R.Rep. No. 78–559 at 1.