Peter BRANTON, Petitioner,

v.

FEDERAL COMMUNICATIONS COM-MISSION and United States of America, Respondents,

Radio–Television News Directors Association, et al., Intervenors.

No. 91–1115.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 9, 1992.

Decided June 1, 1993.

Ronald D. Maines, Salt Lake City, UT, for petitioner.

James M. Carr, Counsel, F.C.C. ("FCC"), with whom Robert L. Pettit, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, Jane E. Mago, Asst. Gen. Counsel, FCC, and Catherine G. O'Sullivan and James W. Lowe, Attys., U.S. Dept. of Justice, Washington, DC, were on the brief, for respondents. Sue Ann Kanter, Counsel, FCC, Washington, DC, entered an appearance, for respondents.

Timothy B. Dyk, with whom Barbara McDowell, Theodore E. Miles, and Karen K. Christensen (for National Public Radio), Paula A. Jameson and Nancy H. Hendry (for Public Broadcasting Service), J. Laurent Scharff, Washington, DC, (for Radio–Television News Directors Ass'n), and Jane E. Kirtley (for Reporters Committee for Freedom of the Press) were on the brief, for intervenors National Public Radio, et al.

Elliot M. Mincberg, Walter A. Smith, Jr., and Andrew Jay Schwartzman, Washington, DC, were on the brief, for intervenors People for American Way and the Washington Area Citizens Coalition Interested in Viewers' Constitutional Rights.

Before BUCKLEY, WILLIAMS, and D.H. GINSBURG, Circuit Judges.

Opinion for the court filed by Circuit Judge D.H. GINSBURG.

D.H. GINSBURG, Circuit Judge:

This is a petition for review of a letter ruling of the Federal Communications Commission refusing to take action against National Public Radio for allegedly broadcasting "obscene, indecent, or profane" language in violation of 18 U.S.C. § 1464. We hold that the petitioner lacks standing under Article III of the Constitution to challenge the FCC's decision.

## I. BACKGROUND

In the early evening of February 28, 1989, NPR's news show "All Things Considered" ran a report on the trial of John Gotti, the alleged leader of an organized crime syndicate in New York. The report featured a tape recording of a wiretapped phone conversation between Gotti and an associate. In the 110–word passage that NPR excerpted from the tape recording for broadcast, Gotti used variations of "the f___ word" ten times. He used it to modify virtually every noun and in one instance even a verb ("I'll f___ing kill you"). NPR made no effort, such as substituting bleeps for any or all of these references, to render the passage less offensive to persons of ordinary sensibility.

Peter Branton, who heard the broadcast and was offended, filed a complaint with the Mass Media Bureau of the FCC. The Bureau concluded that the broadcast material in question was "not actionably indecent" and did not provide "the necessary legal basis for further Commission action" pursuant to 18 U.S.C. § 1464. Mr. Branton then wrote to the Commission asking how he could appeal the Bureau's decision. The Commission treated his letter as an Application for Review and, in a brief letter ruling (over one dissent), affirmed the Bureau's decision. The Commission explained that the Gotti tape was part of a "bona fide" news story; indeed, it had been introduced as evidence in the criminal trial that was the subject of that story. The Commission also noted its long-standing reluctance "to intervene in the editorial judgments of broadcast licensees on how best to present serious public affairs programming to their listeners." Letter Ruling, 6 FCC Rcd. 610 (1991).

Mr. Branton now petitions for judicial review of the agency's decision not to proceed against NPR.

## II. ANALYSIS

■ Article III of the Constitution of the United States limits the scope of the federal judicial power to the resolution of "cases" or "controversies." In order to implement that limitation, the Supreme Court has developed a doctrine of standing that, along with the other requirements for justiciability, assures that the federal judicial power is exercised only in "those disputes which confine federal courts to a role consistent with a system of separate powers and which are traditionally thought to be capable of resolution through the judicial process." *Flast v. Cohen,* 392 U.S. 83, 97, 88 S.Ct. 1942, 1951, 20 L.Ed.2d 947 (1968). Because of "the scope and consequence of the review with which the judiciary is entrusted over executive and legislative action," the federal courts must "observe these bounds fastidiously." *Joint Anti–Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 150, 71 S.Ct. 624, 637, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring).

■ In order to establish standing under Article III, a complainant must allege (1) a personal injury-in-fact that is (2) "fairly traceable" to the defendant's conduct and (3) redressable by the relief requested. *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). The alleged injury must be "distinct and palpable," *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975), not "conjectural" or "hypothetical," *Los Angeles v. Lyons,* 461 U.S. 95, 101–02, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983). Application of these familiar principles leads us to conclude that the petitioner lacks standing to seek review of the FCC no-action letter at issue here.

### A. *Injury-in-fact*

■ In order to challenge official conduct one must show that one "has sustained or is immediately in danger of sustaining some direct injury" in fact as a result of that conduct. *Golden v. Zwickler,* 394 U.S. 103, 109, 89 S.Ct. 956, 960, 22 L.Ed.2d 113 (1969).

This component of the standing doctrine serves both "to assure that concrete adversariness which sharpens the presentation of issues," *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962), and to prevent the federal courts from becoming "continuing monitors of the wisdom and soundness of Executive action...." *Allen v. Wright*, 468 U.S. at 790, 104 S.Ct. at 3345 (quoting *Laird v. Tatum*, 408 U.S. 1, 15, 92 S.Ct. 2318, 2326, 33 L.Ed.2d 154 (1972)).

▇ The petitioner in this case alleges that he was injured because he was subjected to indecent language over the airwaves. While an offense to one's sensibilities may indeed constitute an injury, *see FCC v. Pacifica*, 438 U.S. 726, 748–49, 98 S.Ct. 3026, 3039–40, 57 L.Ed.2d 1073 (1978), a discrete, past injury cannot establish the standing of a complainant, such as Branton, who seeks neither damages nor other relief for that harm, but instead requests the imposition of a sanction in the hope of influencing another's future behavior. "[P]ast wrongs do not in themselves amount to that real and immediate threat of injury necessary to make a case or controversy." *Lyons*, 461 U.S. at 103, 103 S.Ct. at 1666. *See also O'Shea v. Littleton*, 414 U.S. 488, 495–96, 94 S.Ct. 669, 675–76, 38 L.Ed.2d 674 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects").

If the petitioner suffers any continuing injury, we suppose it is in the nature of the increased probability that, should the NPR broadcast go unsanctioned, he will be exposed in the future to similar indecencies over the airwaves. Under established Supreme Court precedent, however, this marginal increase in the possibility of a future harm does not meet the "immediacy" requirement for Article III standing.

For example, in *Los Angeles v. Lyons*, 461 U.S. at 95, 103 S.Ct. at 1660, the Court held that a person injured when a policeman subjected him to a chokehold did not have standing to seek an injunction prohibiting the police department from using that maneuver in the future. The Court reasoned that the plaintiff's single experience with a chokehold did not establish "a real and immediate threat that he would again be stopped for a traffic violation, or any other violation, by an officer or officers who would illegally choke him...." *Id.* at 105, 103 S.Ct. at 1667. *See also Rizzo v. Goode*, 423 U.S. 362, 372, 96 S.Ct. 598, 604, 46 L.Ed.2d 561 (1976) (plaintiffs lack standing to seek injunction against future police misconduct because threat of repeat injury is too "attenuated"); *O'Shea*, 414 U.S. at 495–96, 94 S.Ct. at 675–76. Similarly, in *Lujan v. Defenders of Wildlife*, —— U.S. ——, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), the Court held that an environmental group lacks standing to challenge policies that will allegedly result in the extinction of endangered species if the group can not establish that its members will visit the habitat of those species in the near future. *Id.* —— U.S. at ——, 112 S.Ct. at 2138 (" 'some day' intentions [to travel]—without any description of concrete plans, or indeed even any specification of *when* the some day will be— do not support a finding of the 'actual or imminent' injury that our cases require") (emphasis in original).

▇ In the present case, the possibility that the petitioner will again "some day" be exposed to a broadcast indecency lacks the imminence required under *Lyons, Rizzo*, and *Defenders of Wildlife*. It is mere conjecture that a radio station will again broadcast, at a time when the petitioner is listening, indecencies that would be proscribed under 18 U.S.C. § 1464 (as he would have us interpret that statute). While there is, of course, some chance that somewhere, at some time, the petitioner may again be exposed to a broadcast indecency as a result of the Commission's decision, that possibility seems to us far too remote and attenuated to establish a case or controversy under Article III.

Nothing in *Office of Communications of United Church of Christ v. FCC*, 359 F.2d 994, 1005–06 (D.C.Cir.1966) (*UCC*), is to the contrary. In that case, we held that "responsible and representative groups" in a broadcaster's listening area have standing to challenge the broadcaster's application for a renewal license. The appellants there alleged that a TV licensee had failed to "give a fair and balanced presentation of controversial

issues, especially those concerning Negroes," in violation of the Fairness Doctrine and of the licensee's obligation to operate its station in the public interest. *Id.* at 1000 & 998–99. The court explained that "[s]ince the concept of standing is a practical and functional one designed to insure that only those with a genuine and legitimate interest can participate in a proceeding, we can see no reason to exclude those with such an obvious and acute concern as the listening audience." *Id.* at 1002.

*UCC* is not controlling in the present case for two reasons. First, the appellants in *UCC* alleged that the licensee in question was engaged in a continuing pattern of inappropriate and discriminatory broadcasting, which the FCC by renewing its license had in effect extended. In contrast, the appellant in the present case challenges an FCC determination regarding an isolated indecency broadcast at a single moment in the past. He does not allege a continuing course of misconduct, and there is simply too little reason to believe that the harm to him will ever recur. A listener who alleges that a broadcaster has repeatedly violated the indecency standard might be in a better position to argue that he is subject to a continuing harm or at least an increased likelihood of the harm recurring. *But cf. Lyons,* 461 U.S. at 105, 103 S.Ct. at 1666 (allegation that Los Angeles police "routinely apply chokeholds" fails to establish prior victim's standing).

Second, in the years since *UCC,* the Supreme Court has repeatedly emphasized the "immediacy" element of the injury-in-fact requirement. *See Defenders of Wildlife,* —— U.S. at ——, 112 S.Ct. at 2130 (1992); *Lyons,* 461 U.S. at 96, 103 S.Ct. at 1662 (1983); *Rizzo,* 423 U.S. at 362, 96 S.Ct. at 598 (1976); *O'Shea,* 414 U.S. at 488, 94 S.Ct. at 669 (1974). Accordingly, *UCC* must be understood as a creature of the context from which it arose, *viz.* a license renewal proceeding, which is inherently future oriented.

In sum, the petitioner fails to demonstrate that the FCC's decision not to take action against NPR causes him an injury that is sufficiently "immediate" to establish his standing to challenge that decision. The marginal increase in the probability that he will be exposed to indecent language in the future if NPR is not sanctioned is simply too slight to generate a case or controversy proper for resolution by an Article III court.

### B. *Causation/Redressability*

■■ Even if the harm to the petitioner here were sufficiently immediate to make out an Article III "injury," he would not be able to show that his injury "fairly can be traced to the challenged action" and would be "redressed by a favorable decision." *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 41, 38, 96 S.Ct. 1917, 1925, 1924, 48 L.Ed.2d 450 (1976). Causation and redressability are separate requirements, as is apparent in a case (such as *Allen v. Wright*) where the relief requested goes beyond mere cessation of the official conduct being challenged (there, tax exemption for schools that discriminate on the basis of race) to include additional relief (*viz.* denial of tax exemption to "a considerably broader class of private schools"). 468 U.S. at 747, 753 n. 19, 104 S.Ct. at 3322, 3325 n. 19. The two requirements tend to merge, however, in a case such as this where the requested relief consists solely of the reversal or discontinuation of the challenged action. *Id.* at 759 n. 24, 104 S.Ct. at 3328 n. 24; *Community for Creative Non–Violence v. Pierce,* 814 F.2d 663, 670 (D.C.Cir.1987).

As an initial matter, it should be remembered that the petitioner in the present case is not himself in any way subject to the FCC decision he seeks to challenge. His probabilistic injury (such as it is) "results from the independent action of some third party not before the court," *i.e.,* NPR or some other broadcaster that may in the future offend him with an indecent broadcast. *Simon,* 426 U.S. at 42, 96 S.Ct. at 1926. Under these circumstances, it is "substantially more difficult" for him to establish causation and redressability. *Warth v. Seldin,* 422 U.S. at 505, 95 S.Ct. at 2208.

■■ The Supreme Court is particularly disinclined to find that the causation and redressability requirements are satisfied where a complainant challenges only an Executive Branch decision not to impose costs

or penalties upon some third party. For example, in *Linda R.S. v. Richard D.,* 410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973), the Court held that a parent does not have standing to challenge the state's decision not to enforce a child support statute against the other parent of their illegitimate child. The Court reasoned that it was "at best ... only speculative" that the requested relief (prosecuting and jailing the other parent) would result in the payment of support. *Id.* at 618, 93 S.Ct. at 1149. Similarly, in *Simon,* 426 U.S. at 26, 96 S.Ct. at 1917, the Court held that a low-income individual does not have standing to challenge an IRS regulation establishing the amount of free medical care that a charitable hospital must provide in order to maintain its tax-exempt status. The Court explained that it was "purely speculative" whether the tax regulation caused such hospitals to provide less service than they would otherwise provide free of charge; it was "equally speculative" whether increasing the amount of free service required for tax exemption would in fact increase the provision of free services, since "[i]t is just as plausible that the hospitals ... would elect to forgo favorable tax treatment to avoid the undetermined financial drain" of providing more free treatment. *Id.* at 42–43, 96 S.Ct. at 1926.

■ Finally, in *Allen v. Wright,* 468 U.S. at 737, 104 S.Ct. at 3315, the Court held that minority group parents of public school children lack standing to challenge the legality of a tax exemption insofar as it benefits private schools that discriminate on the basis of race. The parents claimed that the tax exemption facilitated enrollment of white children in the private schools to the detriment of the parents' interest in access to desegregated public education. The Court noted that "the links in the chain of causation between the challenged Government conduct and the asserted injury are far too weak" to establish standing, *id.* at 759, 104 S.Ct. at 3328; it was "entirely speculative" whether withdrawal of the tax exemption would lead any school to change its exclusionary policy or cause parents to transfer their children from a private to a public school in sufficient numbers to "have a significant impact on the racial composition of the public schools." *Id.* at 758, 104 S.Ct. at 3328.

In the present case, it is at least equally conjectural whether the FCC's proceeding against the alleged broadcast indecency of February 28, 1989 would cause any radio station(s) in the petitioner's area to broadcast any fewer indecent programs in the future. As in the cases discussed above, any favorable impact of the official action that the complainant seeks to compel depends utterly upon the actions of "third part[ies] not before the court," *Simon,* 426 U.S. at 42, 96 S.Ct. at 1926, whose behavior is difficult to predict.

For example, radio stations might well decide that the benefits of broadcasting indecent language of the sort petitioner here challenges outweigh the costs of making certain payments to the Government (here in the form of fines rather than of taxes). Predicting the reaction of "public" radio stations to a monetary fine is particularly difficult because such stations are non-profit entities. *See* Henry B. Hansmann, *Reforming Nonprofit Corporation Law,* 129 U.PA.L.REV. 497, 568–69 (1981) ("the patrons of a nonprofit are generally much less able to look out for themselves than are the shareholders in a business corporation"). In addition, as broadcast journalists, even for-profit broadcasters undoubtedly make programming decisions in part with an eye to non-monetary factors, such as their own conception of journalistic integrity. *See* Radio–Television News Directors Association Code of Ethics (stating members' responsibility, inter alia, "to gather and report information of importance and interest to the public accurately, honestly and impartially" and to "evaluate information solely on its merits as news").

As a result, the court can have no confidence that the FCC's failure to impose a sanction upon NPR will lead it or any other broadcaster to injure the petitioner in the future. Or to put the matter conversely, it is speculative whether our reversal of the agency's decision would serve at all to protect the petitioner from future exposure to broadcast indecency.

This holding (and the Supreme Court precedent upon which it is based) may at first seem inconsistent with the fundamental prin-

ciple that increasing the price of an activity (*i.e.,* broadcasting indecency) will decrease the quantity of that activity demanded in the market, or in the language of economics, that demand curves are downward sloping. *See* PAUL A. SAMUELSON & WILLIAM D. NORDHAUS, ECONOMICS 60–61 (12th ed. 1985); RICHARD A. POSNER, ECONOMIC ANALYSIS OF LAW 5 (4th Ed.1992). We would hardly undertake to doubt this basic principle, however. *See Smith v. NTSB,* 981 F.2d 1326, 1328 (D.C.Cir.1993). Rather, our concern is with the magnitude of its effect in this particular case (*i.e.,* with the elasticity of demand for broadcast indecency).

Without some reason to believe that the level of broadcast indecency is significantly affected by the possibility of incurring an FCC sanction, we lack a sufficient basis for the exercise of the federal judicial power. A court is rightly reluctant to enter a judgment which may have no real consequence, depending upon the putative cost-benefit analyses of third parties over whom it has no jurisdiction and about whom it has almost no information.

### III. CONCLUSION

This dispute between the petitioner and the FCC falls outside the constitutional domain of the federal courts. The petitioner fails to establish a justiciable case or controversy because his asserted injury is too attenuated and improbable and because this injury neither resulted from the challenged Government decision nor would be remedied by a reversal of that decision. Accordingly, the petition for review is

*Dismissed.*