**John D. HUDDY, Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee.**

---

Biltmore Broadcasting, LLC, Intervenor.

No. 00–1089.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 5, 2000.

Decided Jan. 19, 2001.

Gene A. Bechtel argued the cause and filed the briefs for appellant.

Roberta L. Cook, Counsel, Federal Communications Commission, argued the cause for appellee. With her on the brief were Christopher J. Wright, General Counsel, and Daniel M. Armstrong, Associate General Counsel. Gregory M. Christopher, Counsel, entered an appearance.

Daniel E. Troy argued the cause for intervenor Biltmore Broadcasting, LLC. With him on the brief were Richard J. Bodorff and E. Joseph Knoll III.

Before: WILLIAMS, GINSBURG and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

John D. Huddy petitions for review of a Federal Communications Commission decision denying his request for a hearing on his challenges to the assignment of a television broadcast license. We dismiss for lack of standing.

Huddy is the sole shareholder of Riklis Broadcasting Corporation, the former owner and licensee of TV station KADY. In July 1996 Riklis entered involuntary bankruptcy and a trustee was appointed to manage the corporation's estate. The FCC consented to an involuntary transfer of the KADY license to the trustee, who

proceeded to auction off the station. John Cobb emerged as the highest bidder. On the trustee's endorsement of his creditworthiness, the bankruptcy court approved the sale. Cobb assigned his purchase rights to Biltmore Broadcasting, of which he is the controlling principal.

In November 1997 Biltmore applied for FCC approval of assignment of the license. Huddy filed a petition asking for a hearing, claiming that Cobb had falsely certified his financial qualifications to the FCC. In support, he asserted that in a phone conversation Cobb had said that he hadn't yet secured funding for the purchase. Cobb responded that Huddy misunderstood his remarks and that he told Huddy only that he had not chosen which of various means of financing he would use. Cobb also struck back, alleging that during the same call Huddy threatened to oppose Cobb's license application unless the latter assisted Huddy in his claims against the Riklis bankruptcy estate. Huddy later added a charge that Cobb had assumed control of KADY before FCC approval of the transfer, in violation of Commission rules. The trustee answered with an affidavit saying that in the relevant period he (the trustee) had controlled all business decisions at KADY.

The FCC ultimately approved the assignment, and on July 1, 1998 the purchase of the television station was consummated. After twice petitioning the FCC to rethink its decision and each time being rebuffed, Huddy sought review here.

■ To be heard on the merits Huddy must first satisfy the three elements of constitutional standing: injury in fact, causation, and redressability. See *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). These elements roughly correspond to the following questions: has Huddy asserted a present or expected injury that is legally cognizable and non-negligible, did the agency's actions materially increase the probability of injury, and will the remedy sought compensate Huddy or materially reduce the expected harm? To satisfy

these requirements Huddy asserts two interests—one as a viewer of KADY and the other as a residual claimant of the bankruptcy estate who would benefit financially if the KADY license were returned to the trustee and re-auctioned. We address each claim in turn.

■ As a resident of the service area and a viewer of the station, Huddy can assert a possible injury to a legally protected interest. Under our precedents listeners or viewers may serve as "spokesmen" for a station's entire audience. See *Office of Communication of the United Church of Christ v. FCC*, 359 F.2d 994, 1002 (D.C.Cir.1966).

■ But Huddy's theory breaks down on causation. At best he raises concerns about Cobb's integrity with respect to the Commission's rules regarding future licensees' behavior in financial matters and to pre-acquisition station control. But he makes no effort to link these business behavior issues with plausible predictions about Cobb's likely programming decisions. To be sure, in the interests of "preserv[ing] the integrity" of its operations, *FCC v. WOKO, Inc.*, 329 U.S. 223, 228, 67 S.Ct. 213, 91 L.Ed. 204 (1946); see also *id.* at 226, 67 S.Ct. 213 (noting Commission authority under 47 U.S.C. § 312(a)), the Commission is entitled to consider a would-be licensee's deceptive behavior as grounds for rejecting an application, *id.*, and even to make denial of a license virtually automatic on evidence of intentional misrepresentations in license applications, see, e.g., *In re Opal Chadwell, Dorothy O. Schulze and Deborah Brigham, Blanco Communications, Ltd.*, 2 FCC Rcd. 5502 at ¶ 14 (1987). Presumably the Commission adopts such sanctions in the interests of good broadcasting—i.e., where it believes they will have a sufficiently favorable effect on broadcasting, in the long run, to justify the various costs of imposing them. But the run may be long indeed. So the authority of the Commission to apply such sanctions doesn't ipso facto support an inference that FCC underenforcement of financial integrity poli-

cies is likely to cause the sort of "material impairment of [a viewer's] hopes or expectations" that is needed to support standing. *Jaramillo v. FCC,* 162 F.3d 675, 677 (D.C.Cir.1998).

Indeed, we've already held that the Commission's failure to inflict pecuniary penalties on a licensee for an isolated breach of the Commission's *program-related* requirements does not increase the probability of future violations enough to afford a listener standing to insist that it pursue those penalties. *Branton v. FCC,* 993 F.2d 906, 909 (D.C.Cir.1993). Huddy's claim is, of course, stronger in the sense that the relief sought would knock out Cobb altogether. But it is weaker in that Huddy shows no logical link between the FCC's overlooking Cobb's alleged business misconduct and a materially increased risk that KADY's programming will not advance the public interest. Rather than offer some affirmative reason to think that FCC neglect of Cobb's alleged improprieties materially increases the risks of harm to listeners, Huddy relies only on the always available supposition that it just might. If that were enough to show standing, listeners could always challenge any underenforcement of any license-related provision of communications law. *Jaramillo,* 162 F.3d at 677.

Huddy's theory here is quite a stretch from prior cases allowing listener standing. In *United Church of Christ,* for instance, listeners sought denial of license renewal on the ground that a TV licensee had failed to "give a fair and balanced presentation of controversial issues, especially those concerning Negroes," and thus violated the Fairness Doctrine, 359 F.2d at 998–99, 1000, a (now-defunct) Commission policy expressly directed at broadcasting content. See *Syracuse Peace Council v. FCC,* 867 F.2d 654 (D.C.Cir.1989). And in *Llerandi v. FCC,* 863 F.2d 79 (D.C.Cir. 1988), listeners challenged FCC approval of a license assignment that allegedly violated the Commission's (since-modified) "duopoly" rule prohibiting common ownership of two stations whose signals overlap, a rule aimed at enhancing "diversification

of viewpoints." *Id.* at 85. In these cases, FCC underenforcement of rules aimed at quality or diversity of program content left a station in the control of a party that allegedly violated such rules.

To bolster his claim Huddy argues that Cobb breached a promise to add a news program to the KADY schedule. To Huddy this is evidence that Cobb will not serve the public interest. Had Cobb made such a promise in an effort to induce favorable action by the Commission, we might agree. But in fact Cobb made no such promise. He simply responded to Huddy's allegation that he had exercised premature control, explaining that in his contacts with the KADY staff he had sought to explore the possibility of launching a newscast after the FCC approved his application. Cobb made no commitment to the FCC or to KADY viewers.

Huddy points out that Cobb had KADY's rating market changed from Santa Barbara to Los Angeles in January 2000, evidently to enable it to force cable companies in Los Angeles to carry its signal. This change was possible only with the approval of the Commission after it considered the effect on local programming. See *In re Comcast Cablevision of Santa Maria, Inc.,* 13 FCC Rcd. 24,192 at ¶¶ 3, 14–17 (1998) (applying standards specified in 47 U.S.C. § 534(h)(1)(C)). Huddy alleges no illegality in that process. In any event, the fact that the change originated with action by Cobb does nothing to overcome Huddy's failure to offer evidence, or even a theory, as to how an alleged lack of candor on financial matters might increase the likelihood of market switches that injure listeners.

■ Huddy's second theory of standing begins with the observation that KADY is more valuable today than when Biltmore purchased it. Here Huddy turns, surprisingly, to the very fact previously invoked to show Cobb's programming treachery, namely his securing Commission approval to shift KADY's market to Los Angeles, with prospects of more lucrative cable carriage. He also says that when the FCC

changed its "television duopoly rules" in August 1999 to allow common ownership of more than one local commercial television station in the same market, the value of stations in all big markets jumped. *In the Matter of Review of the Commission's Regulations Governing Television Broadcasting,* 14 FCC Rcd. 12,903 (1999). Huddy argues that if this court were to remand to the FCC for a hearing on Cobb's integrity, and if the FCC were to revoke Biltmore's license, and if the trustee were to re-auction KADY, Huddy would profit as a residual claimant of the Riklis bankruptcy estate. Although Huddy's counsel seemed to abandon this second theory of standing at oral argument, we include a brief treatment to dispel any belief that it might hold water.

First, the injury to Huddy is (at most) the result of Cobb's alleged lack of candor only in a narrow "but for" sense.[1] Yes, had Cobb not acquired the station, he would not have been able to switch KADY's market. And yes, had the FCC not changed its rules since the bankruptcy sale, the station's market value would not have benefited from the rule change. But there is nothing inherent in the FCC's slack policing of its rules on candor about financial resources or on when a buyer may first exercise control, that tends to bring about the kinds of increases in station value that Huddy asserts. See *Movitz v. First National Bank of Chicago,* 148 F.3d 760, 762–63 (7th Cir.1998); see also *United States v. Dyer,* 216 F.3d 568, 570–71 (7th Cir.2000). Huddy seems implicitly to recognize the lack of any inherent tendency of the FCC's alleged error to produce the alleged injury, identifying the causal link simply as the passage of time since the FCC's action, coupled with two fortuities, Cobb's strategic decision and the Commission's rule change. Reply Br. at 6–7.

We question whether "but for" causation of this sort could ever be sufficient to confer constitutional standing. Certainly Huddy does not point to any standing decision that finds a causal relation based on merely the passage of time and an accompanying change of market conditions. And acceptance of such "but for" causation would effectively enable parties to secure constitutional standing purely at their own volition. Suppose that two persons, without interests at stake in an agency process, had bet a sum of money on its outcome. If "but for" causation of the kind involved here were enough, the party picking the losing side would satisfy the causation prong, and, unless the wager were illegal, standing would ensue. It seems improbable that the Court intends all its learning on constitutional standing to be so readily evaded.

We need not finally decide whether such "but for" causation can ever be enough, as Huddy has not shown that the supposed injury could be redressed. As his counsel conceded at oral argument, the record says nothing on the consequences of an FCC veto of the transfer to Cobb. For all we know, the trustee in bankruptcy would then be required simply to award KADY to the next highest bidder in the original auction. As we have no reason to believe that Huddy would even reap his desired windfall, he flunks the redressability criterion. *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 41–43, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); *Branton v. FCC,* 993 F.2d at 911.

As Huddy lacks standing, his petition for review is

*Dismissed.*

---

1. We say "at most" because even "but for" causation is questionable (apart from the issue discussed in the text below—whether Commission rejection of Biltmore's application would have led to a new auction). The FCC did not change its duopoly rules for another 16 months after its approval of the transfer. Had its decision been the other way, a new auction might well have been completed before the rule change was made or the prospect of its adoption apparent, and Huddy would not have garnered his windfall.