# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued March 23, 2006           Decided July 25, 2006

No. 05-1233

BROTHERHOOD OF LOCOMOTIVE ENGINEERS AND TRAINMEN,
A DIVISION OF THE RAIL CONFERENCE-INTERNATIONAL
BROTHERHOOD OF TEAMSTERS,
PETITIONER

v.

SURFACE TRANSPORTATION BOARD AND
UNITED STATES OF AMERICA,
RESPONDENTS

KANSAS CITY SOUTHERN RAILWAY COMPANY AND
KAW RIVER RAILROAD, INC.,
INTERVENORS

On Petition for Review of an Order of the
Surface Transportation Board

*Gordon P. MacDougall* argued the cause and filed the briefs for petitioner.

*Marilyn R. Levitt*, Attorney, Surface Transportation Board, argued the cause for respondent. With her on the brief were *Thomas O. Barnett*, Acting Assistant Attorney General, U.S. Department of Justice, *John J. Powers, III* and *Robert J.*

*Wiggers*, Attorneys, *Ellen D. Hanson*, General Counsel, Surface Transportation Board, and *Craig M. Keats*, Deputy General Counsel.

Before: GINSBURG, *Chief Judge*, and BROWN and GRIFFITH, *Circuit Judges*.

GINSBURG, *Chief Judge*: The Kaw River Railroad, Inc. (KRR) secured the authorization of the Surface Transportation Board to acquire by lease, sublease, and assignment some 18.2 miles of track controlled by the Kansas City Southern Railway Company (KCS). The Brotherhood of Locomotive Engineers and Trainmen, which represents employees of the KCS, argues the Board did not have jurisdiction to approve the transfer because the track is "switching" track and therefore excepted from STB authority pursuant to 49 U.S.C. § 10906. We dismiss the petition because the Union does not have standing to seek review.

## I. Background

Under the Interstate Commerce Act, as amended, a noncarrier may "acquire a railroad line or acquire or operate an extended or additional railroad line, only if the Board issues a certificate authorizing" the action. *Id.* § 10901(a)(4); *cf. id.* §§ 10901-03, 11323 (rail carrier generally must obtain Board authorization before it may construct, acquire, or initiate or cease operations over, rail line). The Board must exempt a transaction from the authorization process, however, when it determines regulation is unnecessary to carry out the policies of the statute. *See id.* § 10502.

In 2004 the KRR, then a noncarrier, filed with the Board a "Notice of Exemption" pursuant to the Board's "class exemption" procedure, seeking authority to acquire from the

KCS and operate 18.2 miles of track as a common carrier. *See Class Exemption for the Acquisition & Operation of Rail Lines Under 49 U.S.C. 10901*, 1 I.C.C.2d 810 (1985) (exempting nearly all acquisitions and operations from § 10901 unless adversely affected party files petition to revoke exemption); 49 C.F.R. §§ 1150.31-1150.35. Before the KRR made its filing, the KCS had been conducting switching and other operations over the tracks.

The Union filed a petition to revoke the exemption pursuant to 49 U.S.C. § 10502(d), arguing the Board could not approve the transaction because, as "switching" track, it was excepted from the Board's authority. *See id.* § 10906 ("Notwithstanding section 10901 .... [t]he Board does not have authority under this chapter over ... spur, industrial, team, switching, or side tracks"). Unlike a transaction *exempted* under § 10502 from the rigors of § 10901, a transaction *excepted* under § 10906 is outside the Board's authority altogether, so that prior Board approval is neither required nor appropriate.

Whether a transaction is exempt under § 10502 or excepted under § 10906, the result is the same: The Board does not regulate it. The difference was significant to the Union, however, because of the collective bargaining agreement (CBA) the Union had negotiated with the KCS. That CBA provided with respect to transactions "authorized under § 10901," but not with respect to transactions excepted from the Board's authority, that "the arrangements provided [herein] shall be deemed to fulfill all of the parties' bargaining obligations that may exist under any applicable statute, agreement or other authority with respect to such transaction." In other words, the KCS did not have to bargain with the Union before it consummated a transaction authorized under (or exempted from) § 10901. The upshot was that the Union argued the KRR's filing for exemption was "a scam" intended to change the "rates of pay,

rules or working conditions of its employees, ... as embodied in agreements" between the Union and the KCS, 45 U.S.C. §§ 152 Seventh, 156, without following the collective bargaining procedures required by the Railway Labor Act, *id.* § 151 *et seq.*

The Board denied the Union's petition, thereby allowing the transaction to go forward exempt from § 10901. The KRR had disputed the Union's assertion that all the track at issue was switching track, but the Board concluded that "even if the track in question could have been characterized as switching track under 10906 when operated by the previous operator," it was the KRR's prospective use of the track that controlled its characterization. *See Effingham R.R.*, STB Docket No. 41986, 1997 WL 564155 (STB served Sept. 12, 1997), *aff'd sub nom. United Transp. Union-Illinois Legislative Bd. v. STB*, 183 F.3d 606 (7th Cir. 1999); *Bhd. of Locomotive Eng'rs v. STB*, 101 F.3d 718, 726-28 (D.C. Cir. 1996) (transaction subject to Board authority where switching operation had "effect of substantially extending the tenant railroads' lines into new territory"). The Board reasoned that because the "new operation made possible by this transaction constitutes KRR's entire line of railroad," the track was "encompassed by 10901" and the KRR needed either the Board's authorization under, or an exemption from, § 10901. "Merely characterizing the proposed operations as switching does not relieve a rail operator of the obligation to obtain a Board license if the operator is holding out common carrier service to the public over a line of railroad." The Union petitions for review of this decision.

## II. Analysis

The Union argues on review that the Board could not lawfully approve the KRR's acquisition of track from the KCS through its class exemption procedure because the transaction is excepted from the Board's authority under § 10906. The Board

argues the Union lacks prudential standing because its sole interest here is in requiring the KCS to bargain under the RLA. *See Bhd. of Locomotive Eng'rs*, 101 F.3d at 723 (in addition to constitutional requirements of standing, party claiming to be aggrieved by agency action must show "interest sought to be protected by the complainant [is] arguably within the zone of interests to be protected or regulated by the statute ... in question") (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970)).

We begin our analysis, as we must, with the question of our jurisdiction. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93 (1998). Because we conclude we lack jurisdiction under Article III of the Constitution of the United States, we do not address the Board's prudential standing argument. *See High Plains Wireless, L.P. v. FCC*, 276 F.3d 599, 605 (D.C. Cir. 2002) (court has independent duty to assure itself of its jurisdiction); *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 585 (1999) ("It is hardly novel for a federal court to choose among threshold grounds for denying audience to a case on the merits"); *Free Air Corp. v. FCC*, 130 F.3d 447, 448 n.1 (D.C. Cir. 1997) (passing over respondent's prudential standing argument where petitioner lacked Article III standing).

Three elements are necessary to establish the "irreducible constitutional minimum of standing": (1) "injury in fact," (2) "a causal connection between the injury and the conduct complained of," and (3) a likelihood the injury "will be 'redressed by a favorable decision.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citation omitted). The Union argues the injury in this case is twofold. First, it claims the KRR's acquisition of track previously owned or leased by the KCS caused some KCS employees to lose some job shifts to KRR employees and thereby to suffer a partial "loss of employment," a "reduction in earnings," or a displacement to

"less desirable work ... at less desirable locations." Second, the Union claims the Board's exemption of the transaction prevented the Union from invoking the bargaining procedures of the RLA.

We fail to see how the former injury is redressable. If the Union prevails here, the transaction would be excepted from Board authority pursuant to § 10906 rather than exempted from the procedures of § 10901 pursuant to § 10502. The Union advances no reason to believe that as a result the Union's members would be restored to their prior shifts, higher wages, and more desirable work.

The latter injury is redressable, however; if it prevails, the Union would have the opportunity to negotiate with the KCS under the procedures of the RLA because it would avoid the provision in its negotiated collective bargaining agreement, in which it waived the right to bargain anew in the event of a transaction exempted from § 10901. And that is sufficient to meet both the injury and the redressability requirements of the standing inquiry. *See Bhd. of Locomotive Eng'rs*, 101 F.3d at 724 ("The possibility that one characterization of the transaction could lead to greater labor protection than another ... yields sufficient potential for greater protection to [the] employees to provide a justiciable injury").

The Union's claim derails, however, when it hits the requirement of causation. In order to establish causation, the claimed injury -- here the Union's inability, under the terms of its CBA with the KCS, to invoke its right to bargain as provided in the RLA -- must be "fairly ... trace[able] to the challenged action" of the Board, that is, exemption of the track here at issue. *Defenders of Wildlife*, 504 U.S. at 560 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976)). The Board's decision means the Union is not entitled to bargain over

the effects of the transaction only because the Union agreed to that limitation in its CBA. This injury was not in any meaningful way "caused" by the Board; rather, it was entirely self-inflicted and therefore insufficient to confer standing upon the Union. *See Petro-Chem Processing, Inc. v. EPA*, 866 F.2d 433, 438 (D.C. Cir. 1989) (self-inflicted injury does not support standing if it is "so completely due to the [complainant's] own fault as to break the causal chain") (quoting 13 C. Wright, A. Miller & E. Cooper, *Fed. Practice & Procedure: Jurisdiction 2d* § 3531.5 (2d ed. 1984)); *see also McConnell v. FEC*, 540 U.S. 93, 228 (2003) (no standing for political candidates who claimed injury from law increasing limits on "hard money" contributions; injury was caused by "their own personal 'wish' not to solicit or accept large contributions"); *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) (rejecting plaintiff states' standing to challenge defendant states' tax on income of nonresident employees; diminution of taxes paid to plaintiff states was "self-inflicted" by their decisions to credit taxpayers for income taxes paid to other states and no state "can be heard to complain about damage inflicted by its own hand"); *Taylor v. FDIC*, 132 F.3d 753, 767 (D.C. Cir. 1997) (no standing for plaintiffs who claim constructive discharge based upon voluntary resignations); *McKinney v. U.S. Dep't of Treasury*, 799 F.2d 1544, 1555-56 (Fed. Cir. 1986) (union of longshoremen sued by third parties for members' refusal to handle Soviet goods lacked standing to bring own suit to challenge government's refusal to block importation of same as products of forced labor).

As the Board points out, had the Union not traded away its right to bargain over the effects of exempted transactions, it would have no interest -- at least no interest it has identified here -- in seeing the KCS/KRR transaction excepted from the authority of the Board rather than exempted by the Board; its right to bargain would be the same in either event. Therefore,

the Union can no more claim standing than could a person who placed a wager upon the outcome of an agency decision and lost the bet, his rights being otherwise unaffected. Although the gambler would not have lost the wager "but for" the agency's decision, we explained in *Huddy v. FCC*, 236 F.3d 720, 724 (2001), that "acceptance of such 'but for' causation would effectively enable parties to secure constitutional standing purely at their own volition." *See id.* ("Suppose that two persons, without interests at stake in an agency process, had bet a sum of money on its outcome. If 'but for' causation of the kind involved here were enough, the party picking the losing side would satisfy the causation prong, and, unless the wager were illegal, standing would ensue.") (dictum); *see also* William Blackstone, 3 *Commentaries* *452 (describing the "feigned wager" by which, in order to have issue at equity heard by jury at law, the pretended plaintiff "declares that he laid a wager ... with the defendant, that A. was heir at law to B. ...; and thus the verdict of the jurors at law determines the fact in the court of equity"). *But see Cmty. Nutrition Inst. v. Block*, 698 F.2d 1239, 1247 (D.C. Cir. 1983), *rev'd on other grounds*, 467 U.S. 340 (1983) ("A plaintiff need only make a reasonable showing that 'but for' defendant's action the alleged injury would not have occurred") (dictum). The harm suffered, "insofar as it is incurred voluntarily," is simply not "fairly ... trace[able]" to the challenged action of the agency. *Petro-Chem Processing*, 866 F.2d at 438.

The Union argues the cause of its plight is the Board's exemption of the transaction because the exemption would have limited its rights under the RLA even if there were no CBA. The Union cites two cases in support of this proposition. First, in its reply brief it cites *Pittsburgh & Lake Erie R.R. v. Ry. Labor Executives' Ass'n*, 491 U.S. 490, 512 (1989) (*P&LE*), which involved an exempted sale of all the employer's assets to a noncarrier. The Court held that, although the employer could

be required to bargain with its union over the effects of the sale, the union could not in the interim prevent the sale from going forward pursuant to § 6 of the RLA, as amended, 45 U.S.C. § 156 (rates of pay, rules, or working conditions cannot be changed by carrier until completion of bargaining). *P&LE*, 491 U.S. at 512. In the present case the Union (which implicitly assumes the same rule applies to the sale or lease of less than all a carrier's assets) argues that, even if it had not traded away its right to bargain over the effects of an exempt transaction, the Board's approval under (or exemption from) § 10901 would have prevented it from getting an injunction against the KCS/KRR transaction. The Union may be correct, but its point is irrelevant. The relevant question is whether it could have gotten an injunction were the transaction not exempted under § 10502 but instead excepted from the Board's authority under § 10906, and the answer supplied by *P&LE* is no.

In *P&LE,* there was no agreement between the railroad and the union, express or implied, that the carrier would not go out of business or sell its assets. 491 U.S. at 503-04. For this reason, the sale could not be stayed under § 156. *Id.* at 512. Nor was the sale a change in "working conditions" governed by § 156 even in the absence of an agreement, pursuant to *Detroit & Toledo Shore Line R.R. v. United Transp. Union*, 396 U.S. 142 (1969). *See P&LE*, 491 U.S. at 504-11. The Court was clear that its holding "rest[ed] on [its] construction of the RLA and not on the pre-emptive force of [§ 10901]." *Id.* at 512; *see also id.* at 509 ("we find nothing in the RLA to prevent the immediate consummation of P&LE's contract to sell"). The Court's rationale applies equally to limit the Union's ability to enjoin a transaction excepted from the Board's authority under § 10906. It follows that the Union could not have enjoined the sale under the RLA whether the transaction was exempted or excepted. With respect to an injunction, therefore, neither the CBA nor the Board's exemption decision made the Union any

worse off; with respect to bargaining, however, the Union still has only the CBA to blame.

At oral argument counsel also invoked *Brotherhood of Railway Carmen v. ICC*, 880 F.2d 562 (D.C. Cir. 1989), *reversed on appeal sub nom. Norfolk & Western Railway v. American Train Dispatchers' Ass'n*, 499 U.S. 117 (1991), in support of its argument that, quite apart from the CBA, its right under the RLA to bargain was cut off by the Board's exempting the transaction from § 10901 rather than deeming it excepted under § 10906. The significance of that case is to the contrary, however: The Union had the same statutory right to bargain over the effects of the KCS/KRR transaction regardless whether it was exempted from § 10901 or excepted from the Board's authority per § 10906; only the CBA limited its right to bargain over an exempt transaction.

In the cited case, the Supreme Court held agency approval of a merger under what is now 49 U.S.C. § 11323 (Board approval required for consolidation, merger, or acquisition of control of one rail carrier by another) superseded, to the extent necessary to carry out the transaction, the employer's obligation under the RLA to bargain with the union representing its employees. *Am. Train Dispatchers*, 499 U.S. at 131. In doing so, the Court relied upon both § 11341(a) (now § 11321(a)), which provides that consolidations are "exempt from ... all other law ... as necessary to ... carry out the transaction," and upon other provisions of "the Act [imposing] a number of labor-protecting requirements to ensure that the Commission accommodates the interests of affected parties to the greatest extent possible." *See Am. Train Dispatchers*, 499 U.S. at 132-33. Neither aspect of that rationale applies to a transaction subject to § 10901. Unlike a consolidation, merger, or acquisition covered by § 11323, the acquisition of a rail line by a noncarrier subject to § 10901 is not made immune from "all

other law" by § 11321; and § 10901(c) expressly precludes the imposition of labor-protective measures as a condition for approval of a transaction under § 10901. Therefore, as the Supreme Court has made clear, § 10901 does not cut off the Union's right under the RLA to bargain over the effects of an exempt transaction. *See P&LE*, 491 U.S. at 512 (railroad obligated to bargain over effects on working conditions of sale exempted from § 10901). Nor would the Union's right to bargain have been limited were the transaction excepted from the Board's authority pursuant to § 10906, which neither displaces "all other law" -- such as the RLA -- nor permits the Board to impose labor-protective conditions. Accordingly, the Union's rights under the RLA would have been identical regardless whether the transaction was exempted or excepted -- had it not negotiated away its right to bargain with respect to an exempt transaction.

## III.  Conclusion

The Union has failed to identify any injury that is fairly traceable to the Board's decision exempting the KCS/KRR transaction from § 10901. Its only injury -- inability to bargain over the transaction -- is attributable to the Union's having agreed to a CBA waiving its right to bargain over any transaction exempt from § 10901. This injury being self-inflicted, the Union lacks standing to seek review of the Board's decision and its petition is accordingly

*Dismissed.*