# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued September 11, 2007        Decided October 2, 2007

No. 06-1202

SOUTHERN CALIFORNIA EDISON COMPANY,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

---

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

---

*Ellen Amber Berman* argued the cause for the petitioner. Michael D. Mackness and Erin K. Moore were on brief.

*Jeffrey S. Dennis*, Attorney, Federal Energy Regulatory Commission, argued the cause for the respondent. *John S. Moot,* General Counsel, and *Robert H. Solomon,* Solicitor, Federal Energy Regulatory Commission, were on brief.

Before: HENDERSON, RANDOLPH and BROWN, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: This action arises out of a contract between Southern California Edison Company (SCE) and the City of Corona, California (Corona)

under which SCE agreed to install interconnection facilities to provide electrical interconnection service to Corona. Under the parties' Interconnection Facilities Agreement (Facilities Agreement or Agreement), Corona paid SCE in advance the estimated cost of installing the interconnection facilities and SCE agreed to furnish Corona with a final trued-up invoice for the actual installation cost within twelve months after the facilities' in-service date. SCE failed to meet the invoice deadline and instead filed rate revision sheets with the Federal Energy Regulatory Commission (FERC or Commission) some twenty months after the deadline to collect the balance of the costs from Corona. FERC rejected SCE's revised rates on the ground that the twelve-month deadline was a condition precedent to SCE's right to recover the costs and SCE failed to satisfy the condition. *See S. Cal. Edison Co.*, 113 F.E.R.C. ¶ 61,018 (Oct. 11, 2005) (rejecting rate sheets) (FERC Ord.); *S. Cal. Edison Co.*, 115 F.E.R.C. ¶ 61,100 (Apr. 24, 2006) (denying rehearing) (Reh'g Ord.). SCE seeks review of FERC's orders on the ground that the Agreement is governed by California law, under which the twelve-month deadline is not a condition precedent, and SCE is therefore entitled to recover the full costs, less damages (if any) caused by the delay. Because FERC failed to apply California law in interpreting the Facilities Agreement, as the Agreement itself requires, we remand to the Commission to construe the Agreement under applicable California law.

## I.

The facts are largely undisputed. On April 6, 2002, Corona applied to SCE to obtain wholesale distribution service for a proposed electricity distribution facility. In a letter approved by both parties and filed with FERC on August 2, 2002 (Letter Agreement), the parties memorialized an interim agreement both for interconnection service, with a proposed in-service date of December 1, 2002, and for installing the interconnection facilities. Pursuant to the Letter Agreement, Corona paid SCE

an initial deposit of $10,000 toward the installation costs. Letter Agreement ¶¶ 2-3.

On January 31, 2003, SCE filed with FERC a "Service Agreement for Wholesale Distribution Service" and the Facilities Agreement, which the Commission accepted for filing in a letter order issued March 24, 2003. The Facilities Agreement, which by its terms supersedes the Letter Agreement, Facilities Agreement § 5.6, requires Corona to make to SCE an "Interconnection Facilities Payment," which is the sum of all costs "associated with the design, engineering, procurement, construction and installation of the Interconnection Facilities," *id*. §§ 4.14; *see* 4.16, 4.17, 4.19. Under the Agreement:

> Corona shall make payments to SCE for the Interconnection Facilities Payment, according to the payment schedule shown in Exhibit C. The amount of such Interconnection Facilities Payment is based on SCE's cost estimates and shall be subject to later adjustment pursuant to Sections 13.1.8.1 and 13.1.8.2.

*Id*. § 13.1.2. Section 13.1.8 of the Agreement provides:

> Within twelve (12) months following the Interconnection Facilities In-Service Date . . . , SCE shall determine the actual recorded Interconnection Facilities Cost . . . and provide Corona with a final invoice.

Section 13.1.8.1 then provides that, if the estimated costs are less than the actual costs, SCE "will bill Corona for the difference between the amounts previously paid by Corona and the actual recorded costs, without interest, within twenty (20) calendar days of the date of such invoice." Section 13.1.8.2 similarly provides that, if the amounts already paid exceed the actual installation costs, SCE is to refund the overage. The Interconnection Facilities Cost was initially estimated at $54,241.37, *id*. ex. B, with a balance due of $44,241.37 ($54,241.37 less Corona's $10,000 deposit), *id*. ex. C.

In addition to the up-front Interconnection Facilities Payment, the Facilities Agreement imposes on Corona an ongoing monthly "Interconnection Facilities Charge," which is defined as "[t]he monthly charge to Corona to recover the revenue requirements for the Interconnection Facilities, calculated as the product of the Customer-Financed Monthly Rate and the Interconnection Facilities Cost." *Id*. § 4.13. Because it is based in part on the Interconnection Facilities Cost, the Interconnection Facilities Charge is also to be reassessed under the Agreement and, if the actual costs exceed the estimated costs, the Agreement provides that "SCE will bill Corona for the difference between the amounts previously paid by Corona and the amounts which would have been paid based on actual recorded costs, without interest, on the next regular billing." *Id*. § 13.1.8.3. Conversely, if the actual costs are less than the estimated costs, the Agreement provides that "SCE will credit Corona the difference . . . , without interest, on the next regular billing." *Id*. § 13.1.8.4

Finally, the Agreement contains two general provisions of relevance here. The first is a choice of law provision:

**Governing Law**:

Except as otherwise provided by federal law, this Agreement shall be governed by and construed in accordance with, the laws of the state of California.

*Id*. § 23. The second reserves to SCE the right to apply to FERC to revise the interconnection rates:

Nothing contained herein shall be construed as affecting in any way: (i) the right of SCE to unilaterally make application to the FERC for a change in rates, charges, classification, or service, or any rule, regulation, or contract relating thereto, under Section 205 of the Federal Power Act and pursuant to the Rules and Regulations promulgated by FERC thereunder; [or] (ii)

the right of Corona to oppose such changes under Section 205 of the Federal Power Act . . . .

*Id*. § 18.2.

SCE installed the interconnection facilities as agreed, but with an in-service date of January 4, 2003. *See* FERC Ord. at 3; Corona's "Motion to Intervene, Protest, and Motion to Reject" (Protest Motion) at 4; SCE's "Answer to Motion to Intervene, Protest and Motion to Reject" (Answer to Protest Motion) at 3-4. Although the Interconnection Facilities Costs apparently exceeded the cost estimate in the Facilities Agreement, SCE did not submit a final invoice or bill Corona pursuant to section 13.1.8.1.[1] Answer to Protest Motion at 4. Instead, on August 17, 2005, SCE filed revised rate sheets with FERC pursuant to section 18.2 of the Agreement. In its filing, SCE claimed total installation costs of $72,198.50 and, accordingly, sought a supplemental Interconnection Facilities Payment of $17,957.13 and additional Interconnection Facilities Charges totaling $365.99 up to that time. Corona protested the revised rate sheets, asserting FERC should reject them as "inconsistent with rate [sic] on file with the Commission," namely the previously filed Facilities Agreement requiring SCE to provide Corona with an invoice for the additional costs sought within twelve months after the interconnection facilities' in-service date. Protest Motion at 4-5. SCE countered that FERC should accept the revised rate as "just and reasonable" and that, under governing California law, SCE's "breach" was not material and therefore

---

[1]According to SCE, it "finalized the true-up internally in December 2003" and "informed Corona of the difference between the actual costs and the estimated costs of the Interconnection Facilities around that time." Answer to Protest Motion at 4. According to Corona, SCE—apparently for the first time—"indicated that there had been cost overruns" in a letter dated May 7, 2004 but did not provide Corona with an invoice before then or thereafter. Protest Motion at 4.

Corona's remedy was limited to the damages, if any, attributable thereto. Answer to Protest Motion at 4-8.

In an order issued October 11, 2005, the Commission rejected the revised rate sheets. The Commission concluded the revised rates are "contrary to the contract" because the Facilities Agreement requires SCE "to provide Corona with a final invoice within twelve months of the interconnection facilities' in-service date," that is, no later than January 4, 2004, and "SCE did not submit the final invoice through [the rate sheet] filing until August 17, 2005, 20 months after the deadline." FERC Ord. at 3. The Commission therefore concluded that "SCE slept on its rights and thus forfeited the additional payment under the contract." *Id.*

SCE filed a request for rehearing, asserting that FERC had not applied California law, as the Facilities Agreement requires, and that under California law SCE's delay in performance was not a material breach that excused Corona's performance. *See* SCE Req. for Reh'g at 8-10. FERC denied the reconsideration motion in an order issued April 24, 2006 on the ground that "[t]he contractual language . . . establishes a condition precedent for SCE to recover true-up costs" and "SCE failed to meet that condition precedent." Reh'g Ord. at 4. The Commission rejected Corona's California law argument, stating:

> With regard to SCE's argument that the Commission should have applied state law, we note that first the Facilities Agreement provides that the agreement "shall be governed by, and construed in accordance, with the laws of the state of California, *except as otherwise provided by federal law.*" SCE's arguments focus on an outcome based on California law. However, SCE sought to collect these additional costs by filing its amended rate sheets with the Commission. SCE's request involves interpreting a jurisdictional agreement that is on file with the Commission and that contains rates, terms, and

conditions of service by a public utility. Accordingly, it was appropriate for the Commission to review SCE's filing to collect the additional costs and the Facilities Agreement based on Commission precedent.

*Id*. at 4-5 (emphasis by FERC) (footnote omitted).

SCE petitioned for review of FERC's orders on June 15, 2006.

## II.

### A.

Before addressing the merits of SCE's petition, we consider FERC's challenge to SCE's standing under Article III of the United States Constitution. *See Steel Co. v. Citizens for Better Env't,* 523 U.S. 83, 94-102 (1998). FERC contends SCE lacks standing because SEC's claimed injury—its inability to collect the trued-up costs—is "not fairly traceable to the challenged Commission Orders" but is attributable instead to SCE's own consent to the Facilities Agreement's twelve-month deadline to invoice additional costs and its failure to provide an invoice within the twelve-month period; therefore, FERC asserts, SCE's injury is "entirely self-inflicted." Resp't's Br. at 9. In support, FERC relies on our decision in *Brotherhood of Locomotive Engineers & Trainmen v. Surface Transportation Board*, 457 F.3d 24 (D.C. Cir. 2006). FERC's reliance is misplaced.

In *Brotherhood of Locomotive Engineers*, the petitioner union argued that certain railroad track about to be acquired by a new operator was "switching" track and was therefore governed by 49 U.S.C. § 10906 (which removes acquisition of switching track from Surface Transportation Board jurisdiction) rather than by 49 U.S.C. § 10901 (which governs acquisition of a railroad line generally and under which the Surface Transportation Board had exercised jurisdiction and exempted the subject track from certification). The reason the nature of the

track mattered to the union was that it had negotiated away its right to bargain with respect to any transaction "authorized under § 10901," 457 F.3d at 26, and therefore if the track were found to come under section 10901 rather than under section 10906, the transferring operator would not be required to bargain with the union before consummating the transfer to the new operator. We concluded that the union lacked standing because its injury was "entirely self inflicted," explaining that "had the Union not traded away its right to bargain over the effects of exempted transactions, it would have no interest" in which statute applied. *Id.* at 28. FERC contends that SCE likewise lacks standing because its inability to recover the true-up costs is attributable to its agreement to a twelve-month time limit; but this case differs from *Brotherhood* in one crucial respect.

In *Brotherhood*, there was no dispute that the union through its collective bargaining agreement voluntarily relinquished its right to bargain in any section 10901 transaction or that its relinquishment of the right caused its injury (the inability to bargain).[2] Here, by contrast, it is sharply contested whether SCE

---

[2]Similarly, in two other cases FERC cites, Resp't's Br. at 12 n.5, it was undisputed that the parties found to lack standing committed voluntary acts that caused the alleged injuries. *See Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) (plaintiff states lacked standing to challenge other states' income tax on nonresident employees because their injury—decreased tax income—was "self-inflicted" by their own decision to credit taxpayers for taxes paid to other states); *Petro-Chem Processing, Inc. v. EPA*, 866 F.2d 433, 438 (D.C. Cir. 1989) (trade organization lacked standing to challenge agency decision allowing members' competitors to use less expensive methods of hazardous waste disposal because claimed injury—exposure to increased clean-up liability caused by bowing to competitive pressure to use cheaper, laxer method—was "so completely due to the [complainant's] own fault as to break the causal chain" (quotation omitted)).

in fact forfeited its right to recover the costs if it did not provide an invoice within the twelve-month period. Whether the Agreement makes recovery contingent on timely invoicing is precisely the issue of contract construction and law that FERC decided in its orders and that the parties argue here. Thus, FERC's argument "is nothing more than an effort to bootstrap standing analysis to issues that are controverted on the merits." *Pub. Citizen v. FTC*, 869 F.2d 1541, 1549 (D.C. Cir. 1989). Yet, "in reviewing the standing question, the court must be careful not to decide the questions on the merits for or against the [petitioner], and must therefore assume that on the merits the [petitioner] would be successful in [its] claims." *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003) (citing *Warth v. Seldin*, 422 U.S. 490, 502 (1975); *Am. Fed'n of Gov't Employees v. Pierce*, 697 F.2d 303, 305 (D.C. Cir. 1982)). Assuming here that SCE will prevail, we must therefore assume for the purpose of standing that, as it argues, it did not relinquish its right to recover actual costs by agreeing to the twelve-month deadline. Accordingly, we reject FERC's standing argument.

### *B.*

On the merits, SCE contends that FERC erred in failing to apply California contract law as required under the Facilities Agreement and that, under California law, the twelve-month invoice deadline is not a condition precedent to recovering the balance of the actual installation costs. In reviewing FERC's interpretation of a FERC-approved contract such as the Facilities Agreement, the court "employ[s] a variation of the now familiar 'two-step' first performed by the United States Supreme Court in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)." *Ameren Servs. Co. v. FERC*, 330 F.3d 494, 498 (D.C. Cir. 2003) (citing *Cajun Elec. Power Coop. v. FERC*, 924 F.2d 1132, 1135-36 (D.C. Cir. 1991); *Appalachian Power Co. v. FERC*, 101 F.3d 1432, 1435 (D.C. Cir. 1996)). "Applying *Chevron* in this context, we first consider *de novo*

whether the [Facilities Agreement] unambiguously addresses the matter at issue. If so, the language of the agreement controls for we 'must give effect to the unambiguously expressed intent of' the parties." *Id*. (quoting *Chevron*, 467 U.S. at 843) (internal citation omitted). We conclude that the choice of law provision in the Facilities Agreement unambiguously requires that the Commission apply California law and that the Commission therefore erred in failing to so do.

As already noted, the Agreement's choice of law provision states: "Except as otherwise provided by federal law, this Agreement shall be governed by and construed in accordance with, the laws of the state of California." Facilities Agreement § 23. Notwithstanding this language plainly mandates that the Agreement be construed under California law unless federal law is in conflict, FERC concluded it was "appropriate for the Commission to review SCE's filing to collect the additional costs and the Facilities Agreement *based on Commission precedent*" because "SCE sought to collect these additional costs by filing its amended rate sheets with the Commission" and "SCE's request involves interpreting a jurisdictional agreement that is on file with the Commission and that contains rates, terms, and conditions of service by a public utility." Reh'g Ord. at 5 (emphasis added). Thus, FERC appears to have selected federal law over California law simply because the Agreement was filed with the Commission, without identifying any difference between federal and California law to justify such selection under the first clause of the choice of law provision. In this the Commission erred. The Commission may not ignore the plain language of a contract but instead must "give effect to the unambiguously expressed intent of the parties." *Ameren Servs.*, 330 F.3d at 498 (quotation omitted). Nor is the Commission's obligation to apply state law altered because the Agreement has been filed as part of a rate case. *See Pennzoil Co. v. FERC*, 789 F.2d 1128, 1142 (5th Cir. 1986) (" '[T]he appropriate contract law to apply is the law that would govern the parties' dealings

were there no regulation at all of the contract's subject matter.' " (quoting *Pennzoil Co. v. FERC*, 645 F.2d 360, 383-84, 387 (5th Cir.1981), *cert. denied*, 454 U.S. 1142 (1982))); *cf. Sam Rayburn Dam Elec. Coop. v. Fed. Power Comm'n*, 515 F.2d 998, 1009 (D.C. Cir. 1975) (noting Federal Power Commission "suggested no reason that the recognized law governing contracts should be ignored merely because the subject matter of a contract falls under the jurisdiction of the FPC"). In fact, that FERC accepted the Facilities Agreement as filed, with the choice of law provision intact, only strengthens the case for enforcing the provision. Finally, accepting FERC's choice of law argument would permit FERC to disregard a choice of law provision in any FERC-approved contract. Accordingly, we reject this argument.

Because the Commission did not give effect to the unambiguously expressed intent of the parties that California law govern construction of the Interconnection Facilities Agreement, we grant SCE's petition for review and remand to the Commission to enforce the Agreement's choice of law provision and to determine whether the twelve-month deadline to provide an invoice to Corona is a condition precedent under California law.

*So ordered.*